**UNITED STATES of America,**
**Appellee,**

**v.**

**Roger AARONS and Robert Swann,**
**Appellants.**

**No. 42, Docket 27483.**

United States Court of Appeals
Second Circuit.

Argued Oct. 5, 1962.

Decided Oct. 30, 1962.

Catherine G. Roraback, New Haven, Conn., for appellants.

Robert L. Keuch, Washington, D. C. (J. Walter Yeagley, Asst. Atty. Gen., Robert C. Zampano, U. S. Atty., Dist. of Connecticut, Kevin T. Maroney, Atty., Dept. of Justice, Washington, D. C.), for United States.

Before LUMBARD, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge.

The nuclear powered submarine, U. S. S. Ethan Allen, capable of firing Polaris missiles, was to be launched from the

ways of the Electric Boat Company into the Thames River at New London on November 22, 1960. Between June and November, a group called the Committee for Non-Violent Action (CNVA), which had established headquarters in New London, conducted demonstrations against the Polaris program; these included entering the grounds of the Electric Boat Company and, on October 20, boarding two other nuclear powered submarines tied up at moorings there. On November 8, Captain Kenner, the Submarine Force Legal Officer at New London, warned the Committee by registered letter that the submarines had been "posted" pursuant to 50 U.S.C. § 797, and that anyone boarding them would be subject to prosecution as provided by that statute. On November 21, the CNVA acknowledged the warning, and the attendant risk of punishment, and gave notice of its intention that "sometime during the morning [of November 22] several Polaris Action volunteers, willing to take the risk mentioned above, will attempt in some way to block the launching of the Ethan Allen."

Even before this, the Navy had asked the assistance of the Coast Guard in controlling river traffic on the day of the launching. On November 17, in response to this request, the Commander of the 3rd Coast Guard District had issued a "Special Notice" closing the Thames River at New London between the latitudes of 41°20′32″ and 41°21′00″ on November 22 from 11 A.M. until one hour after the launching of the Ethan Allen, which was scheduled for noon that day. The latitudes were those of the boundaries of the Electric Boat Company's property. The Coast Guard order directed all persons and vessels "to remain outside of the closed area", and warned of penalties for its violation pursuant to 50 U.S.C. § 192. This order was published in the Local Notice to Mariners dated November 17, 1960, and a copy was sent by registered mail to the CNVA which acknowledged it; however, it was not published in the Federal Register.

The CNVA was not to be thus thwarted. Shortly before 11 A.M. on November 22, a canoe and a rowboat started down the Thames River toward the restricted area. Appellant Aarons, who had seen a copy of the Coast Guard order at the CNVA's office, was in the rowboat. This boat, called the World Citizen, approached the restricted area and was intercepted by a Coast Guard boat whose commander gave the rowboat's three occupants a copy of the order. The World Citizen nevertheless continued into the area, as did the canoe, and was there when the whistles blew at 11 A.M. A Coast Guard boat then came over and took it in tow; one of its occupants—not Aarons—jumped overboard and swam toward the submarine but was picked up by a Coast Guardsman. Meanwhile, a second rowboat entered the restricted area. Appellant Swann, a member of the CNVA, was in the CNVA office and on the shore in New London on the day of the launching; he helped to get the canoe and one of the rowboats into the water, and to plan and coordinate the entire demonstration. He too knew of the Coast Guard order.

Appellants and others were indicted in the District Court for Connecticut, under 50 U.S.C. § 192, for knowing violation of the order, which the Government claimed was validly issued under 50 U.S.C. § 191. Aarons was tried by the court, Swann by a jury; both were convicted and sentenced to one year's imprisonment, suspended after 90 days, and were placed on probation for five years thereafter.

Appellants' first challenge, to the statutory basis of the Coast Guard order, requires us to trace the chain of title on which the Government relies. Prior to 1950, 50 U.S.C. § 191, empowering the Secretary of the Treasury to make, subject to the approval of the President, "rules and regulations governing the anchorage and movement of any vessel, foreign or domestic, in the territorial waters of the United States," depended on a Presidential declaration of a national emergency. The Magnuson Act of August 9, 1950, 64 Stat. 427, amplified this by providing that "Whenever the President finds that the security of the United States is endangered by reason of actual

or threatened war, or invasion, or insurrection, or subversive activity, or of disturbances or threatened disturbances of the international relations of the United States," he is authorized to issue rules and regulations designed, among other purposes, "to safeguard against destruction, loss, or injury from sabotage or other subversive acts, accidents, or other causes of similar nature, vessels, harbors, ports, and waterfront facilities in the United States, * * *." By Executive Order No. 10173, issued October 18, 1950, 15 F.R. 7005, President Truman, finding "that the security of the United States is endangered by reason of subversive activity," invoked the Magnuson Act and prescribed various regulations which constitute Part 6, Subchapter A, Chapter I, Title 33 of the Code of Federal Regulations. Two of these are as follows:

"§ 6.04–5 *Preventing access of persons, articles or things to vessels or waterfront facilities.* The captain of the port may prevent any person, article or thing from boarding or being taken on board any vessel or entering or being taken into any waterfront facility when he deems that the presence of such person, article or thing would be inimical to the purposes set forth in § 6.04–8.

"§ 6.04–8 *Possession and control of vessels.* The captain of the port may supervise and control the movement of any vessel and shall take full or partial possession or control of any vessel or any part thereof, within the territorial waters of the United States under his jurisdiction, whenever it appears to him that such action is necessary in order to secure such vessel from damage or injury, or to prevent damage or injury to any vessel or waterfront facility or waters of the United States, or to secure the observance of rights and obligations of the United States."

By virtue of § 6.04–1, all authority and power vested in the captain of the port may be exercised by the Coast Guard's District Commander.

■■■ The Special Notice of November 17, 1960, fell within the authority thus conferred. It is immaterial whether the execution of the CNVA's announced intention "to block the launching of the Ethan Allen" would constitute "subversive activity," although we do not understand why it would not. The statute says that so long as the President has found that the security of the United States is threatened generally by subversive activity, he may promulgate regulations to safeguard vessels not only from "sabotage or other subversive acts" but also from "accidents"; at the very least, appellants' activities threatened these. Appellants point to what they deem the anomaly that 50 U.S.C. § 192 authorizes a punishment of up to ten years' imprisonment and a $10,000 fine for the felony of violating regulations under § 191, whereas 50 U.S.C. § 797, 64 Stat. 1005 (1950), enacted less than seven weeks after the Magnuson Act, sets a maximum of one year's imprisonment and a $5,000 fine for the misdemeanor of violating regulations issued "for the protection or security of military or naval aircraft, airports, airport facilities, vessels, harbors" etc. The Government answers that § 797 applies at any time, whereas §§ 191 and 192 can be invoked only when the President finds that the national security is endangered, and thus deal with a situation of greater gravity. We have no occasion to speculate on the reasons for the disparity between the penal provisions of the two statutes; we see no basis for excluding the Ethan Allen, which is surely a "vessel", from the broad scope of the Magnuson Act merely because it belongs to the Navy and could thus be protected under § 797 as well.

■■■ Appellants say the prohibited area was larger than needed; the Government answers that the whole width of the river was properly restricted since no one knew how far across the submarine would go on her launching, and that it was also legitimate to prevent access by water to any part of the Electric Boat Company's property during that time. Courts should not second-guess the executive in such

matters when there is no indication that the action taken was anything but a good faith effort to protect property deemed essential to the interests of the United States. In any event this argument cannot avail appellants. Their demonstration was in the very area where damage to the submarine was most likely—the canoe that Swann helped to launch "was almost up on top of the submarine, right on back of it," and the two rowboats were directly in the way of the launching.

Appellants urge that if the Magnuson Act be construed as authorizing the Coast Guard's Special Notice, its application to them here violates the First Amendment. But the same Charter that adjures Congress to "make no law * * abridging the freedom of speech * * * or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances", empowers it "To provide and maintain a Navy", Art. I, § 8, as a means of securing one of the objectives of the preamble, to "provide for the common defence." Appellants were not denied the right to demonstrate in the streets or public places of New London or, indeed, on the Thames River itself save for an area about a thousand yards square for two hours. This seems a not unreasonable reconciliation of a minority's right to protest against Polaris submarines with the right of the majority to give the nation the protection of naval vessels which their representatives in the legislative and executive branches of the Government deem required "for the common defence". Even if we were to assume in appellants' favor that action designed "to block the launching" constituted speech or assembly, "freedom of speech * * * does not comprehend the right to speak on any subject at any time," American Communications Ass'n v. Douds, 339 U.S. 382, 394, 70 S.Ct. 674, 682, 94 L.Ed. 925 (1950), or any place, Poulos v. New Hampshire, 345 U.S. 395, 405, 73 S.Ct. 760, 97 L.Ed. 1105 (1953).

Appellants' serious argument is that the Special Notice cannot be enforced against them because it was not published in the Federal Register as, they maintain,

was required by the Federal Register Act (hereafter FRA), 44 U.S.C. §§ 301–314, and by § 3(a) of the Administrative Procedure Act (hereafter APA), 5 U.S.C. § 1002(a). Although even those deeply sympathetic with the purpose of these statutes may be surprised to encounter them in this context, appellants are right in saying that publication was required; they are wrong, however, in contending that failure to publish immunizes them from prosecution despite their actual knowledge.

Section 5 of the FRA, 44 U.S.C. § 305, requires publication in the Federal Register of "such documents or classes of documents as the President shall determine from time to time have general applicability and legal effect," with a proviso that "for the purposes of this chapter every document or order which shall prescribe a penalty shall be deemed to have general applicability and legal effect." Appellants say the Special Notice came within the proviso; the Government answers that it does not because the statute, 50 U.S.C. § 192, not the Special Notice, prescribes the penalty – – – a position sustained by Chief Judge Anderson in United States v. Richman, 190 F.Supp. 889, 892 (D.Conn., 1961); see also Cafeteria & Restaurant Workers Union, Local 473 v. McElroy, 109 U.S. App.D.C. 39, 284 F.2d 173, 179 and n. 24 (1960), aff'd without discussion of this issue, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). We find it unnecessary to pass upon this. Regulations issued pursuant to § 6 of the FRA by the Administrative Committee of the Federal Register, 1 C.F.R. § 1.32 (1949), define "documents having general applicability and legal effect" as including

"every document, issued under proper authority, prescribing a penalty or a course of conduct * * * and relevant or applicable to the general public, the members of a class or the persons of a locality, as distinguished from named individuals or organizations * * *."

Whether or not the Special Notice prescribed a penalty, it prescribed "a course

of conduct" for "the general public" or "the persons of a locality". Hence publication was required.

What is not so clear is the consequence of the omission. The only explicit sanction in the FRA is the provision in § 7, 44 U.S.C. § 307, that

> "no document required under section 305(a) of this title to be published in the Federal Register shall be valid as against any person who has not had actual knowledge thereof until the duplicate originals or certified copies of the document shall have been filed * * * and a copy made available for public inspection as provided in section 302 of this title * * *."

It would seem reasonable to conclude that Congress meant such a document to "be valid as against any person who has * * * had actual knowledge thereof" even though the duplicate originals or certified copies were not filed as required by § 2 of the FRA, 44 U.S.C. § 302, and therefore were never published. Yet Hotch v. United States, 212 F.2d 280, 14 Alaska 594 (9 Cir. 1954), construed the quoted language in § 7 as making actual knowledge a sufficient substitute only for the filing requirement of § 2, but not for what the Court considered the "independent requirement of publication" under § 5. We are unable to follow this. The filing and publication requirements of the FRA are not independent. Section 2 directs the agency to do the filing with the Administrator of General Services, who then puts the publishing machinery in motion; filing is the true requirement made of the agency, since publication is then to follow automatically. The FRA was passed to mitigate the hardship of the principle *ignorantia legis neminem excusat* in an age when much "law" takes the form of executive or administrative action not to be found in the statute books. See Griswold, Government in Ig-

norance of the Law—A Plea for Better Publication of Executive Legislation, 48 Harv.L.Rev. 198 (1934). Hence the provision that no document required to be published should be valid against a person ignorant of it until it was filed for publication. We find no reason to believe that the framers of the Act wished similarly to relieve persons who knew just what the Government required of them. See Eastern Air Lines v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62, 69 (1955), rev'd on other grounds, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796, order of reversal modified and case remanded, 350 U.S. 962, 76 S.Ct. 429, 100 L.Ed. 835 (1956), ruling on this issue adhered to, 99 U.S.App.D.C. 205, 239 F.2d 25, 28 (1956), cert. denied, 353 U.S. 942, 77 S.Ct. 816, 1 L.Ed.2d 760 (1957); United States v. Reid, 110 F.Supp. 253, 256–257 (D.Md.1955); 1 Davis, Administrative Law Treatise § 6.10, at 395–396 (1958); 68 Harv.L.Rev. 535, 536 (1955) (commenting on the Hotch decision). This consideration has special force when the problem arises under a statute itself demanding proof that the defendant "knowingly" failed to comply with a regulation.[1] It would be rather anomalous that although publication in the Federal Register would not have sufficed to create criminal liability in the absence of actual knowledge, lack of publication should be fatal when actual knowledge exists. See United States v. Richman, supra, 190 F. Supp. at 892.

It was suggested in the Hotch opinion, and appellants argue here, that whatever be the effect of actual knowledge under the FRA alone, enforcement of an unpublished order must be denied when the APA also is taken into account. The relevant provision is § 3, entitled "Public Information". This provides, in part, as follows:

> "Except to the extent that there is involved (1) any function of the

---

1. This requirement of guilty knowledge was specifically added to the penal provision of the Magnuson Act, 50 U.S.C. § 192(a), on the floor of the Senate in order to protect "an innocent person who, wholly innocently and ignorantly, may have committed a violation of some of the regulations." 96 Cong.Rec. 10796 (81st Cong.2d Sess., July 21, 1950).

United States requiring secrecy in the public interest or (2) any matter relating solely to the internal management of an agency—

"(a) *Rules.*—Every agency shall separately state and currently publish in the Federal Register * *. (3) substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public, but not rules addressed to and served upon named persons in accordance with law * * *."

 There appears to be no basis for doubting that the Coast Guard's Special Notice is a "rule" within the definition found in § 2(c) of the APA, 5 U.S.C. § 1001(c). Neither is there any reason to question that the Coast Guard is an "agency" as defined in § 2(a) of the APA, 5 U.S.C. § 1001(a), even when as here it is acting in aid of the Navy. Although the Coast Guard is "a military service", 14 U.S.C. § 1, the military is excluded from the definition of "agency" only to a limited degree, and even then "except as to the requirements of section 3." The broad exception for "any military, naval, or foreign affairs function of the United States" made in § 4, which governs rule-making procedures, reinforces the construction that no exception of similar latitude was intended in § 3. Neither can the Special Notice be brought within the exceptions stated in the preamble to § 3 itself. Whatever the secrecy of the design of the Ethan Allen, there was none as to the measures for protecting her on the launching—secrecy as to

these was exactly what was not required; and it hardly needs to be argued that the order here at issue was not one "relating solely to the internal management" of the Coast Guard. Compare Cafeteria & Restaurant Workers Union, Local 473 v. McElroy, supra, 284 F.2d at 179. Equally plainly, the Notice did not come within the exception in § 3(a) (3) for "rules addressed to and served upon named persons in accordance with law"—an exception whose narrow phrasing refutes the view that all rules of merely local or temporary application were excluded from the scope of the general language. We are thus unable to sustain a contention that although the Coast Guard's order is within the language of § 3(a) (3), it should nevertheless be excluded as something other than what Congress had in mind. When Congress has been at such pains narrowly to limit the exceptions to the requirement of publishing "substantive rules adopted as authorized by law" in the Federal Register, even with respect to military and naval matters, courts ought not to broaden these on a hunch that it might have been wiser to have provided some means for exempting orders emergent in nature or local and momentary in application, for which other forms of publication may be more suitable.

 However, our determination that § 3(a) (3) of the APA required the Special Notice to be published in the Federal Register[2] does not, in our view, lead automatically to a conclusion that "if the rule itself is not published, it follows that it has not been issued; and if a rule has not been issued, it has no force as law." Hotch v. United States, supra, 212 F.2d

2. We have also considered the possibility that § 3(b), directing every agency to "publish" all final adjudicative opinions and orders "and all rules", without requirement that this be in the Federal Register,—might mean that since the Notice here was "published", it is immaterial that this was not in the Register. However, apart from the incongruity of such a construction, the legislative history makes plain that the words "and all rules" were added to § 3(b) by House amendment to compel the publication in some form of the "rules addressed to and served upon named persons in accordance with law," which the House had simultaneously excepted from § 3(a) (3), not to confer an option to avoid Federal Register publication of the rules required to be so published by § 3(a) (3). See Legislative History of APA (G.P.O.1946) at 284, notes 6 and 7; Attorney General's Manual on the APA (1947), page 24.

at 284.[3] The APA does not say so; indeed, a superficially tempting approach would conclude that no sanction for failure to comply with § 3(a)(3) was intended, since the final sentence of § 3(a), "No person shall in any manner be required to resort to organization or procedure not so published", plainly refers only to § 3(a)(1) and (2), requiring publication of agency organization and procedure, rather than to § 3(a)(3). Yet it is hardly to be thought that Congress intended failure to comply with its mandate as to publication of substantive rules in the Federal Register to be wholly without consequence.

We think the reason Congress prescribed a sanction for failure to publish the statements of agency organization and procedure covered by § 3(a)(1) and (2), but not for failure to publish the substantive rules included in § 3(a)(3), was that the latter, which would ordinarily be of "general applicability and legal effect", were already covered by §§ 5 and 7 of the FRA, whereas the former perhaps were not; it is stated in the legislative history of the APA that § 3(a) "is not intended to repeal the Federal Register Act * * * but simply to require the publication of certain additional material", Legislative History of APA, at 225 (Att'y Gen.'s statement). If this view be sound, our conclusion that appellants' actual knowledge bars them from complaining of the failure here to comply with the FRA applies equally to the failure to comply with § 3(a)(3) of the APA. Indeed, the legislative history indicates that Congress considered that even the unequivocal language of the last sentence of § 3(a) of the APA was subject to an exception where actual knowledge existed, and also that this was what § 7 of the FRA meant. A "memorandum of the Department of Justice" which was put into the record on the floor of the House (Legislative History of APA, at 415), says:

"Section 3(a) provides that there shall be publication in the Federal Register of the rules of the various agencies of the Government. The last sentence of section 3(a) states: 'no persons shall in any manner be required to resort to organization or procedure not so published.' But this does not mean that a person who has actual notice is not required to resort to agency organization or procedures if it has not been published in the Federal Register. If a person has actual notice of a rule, he is bound by it. The only purpose of the requirement for publication in the Federal Register is to make sure that persons may find the necessary rules as to organization and procedure if they seek them. It goes without saying that actual notice is the best of all notices. At most, the Federal Register gives constructive notice. See 44 U.S.C. sec. 307." [4]

Since, as we hold, failure to file or publish as required by the FRA is without consequence as against a person having actual knowledge, the same is true with respect to failure to publish as required by § 3(a)(3) of the APA.

We find appellants' other contentions to be without merit.

Judgments affirmed.

3. We are not here dealing with a case where the rule-making procedures prescribed by § 4 of the APA have not been followed, as to which, in some instances, different considerations may apply; the Special Notice was within the exception to § 4 for "any military, naval, or foreign affairs function of the United States."

4. See also Attorney General's Manual on the APA, at 21, where it is stated, as an illustration of the final sentence in 3 (a), that "Should an agency fail to publish, for example, a listing of its field offices with their functions, persons who have not received actual notice of such agency organization may contend that they are not bound to resort to a field office prior to institution of their case in the central office."