582 F.2d 1194
 UNITED STATES of America, Plaintiff-Appellee,
v.
Karl Anthony MOWAT, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Francis N. KAUHANE, Jr. and Charles K. Warrington, Jr.,
Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rae Mei-Ling CHANG, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Walter RITTE, Jr. and Richard Sawyer, Jr., Defendants-Appellants.
 Nos. 77-2944, 77-3096, 77-3097 and 77-3284.
 United States Court of Appeals,
Ninth Circuit.
 July 18, 1978.
Rehearing Denied in No. 77-3284 Aug. 15, 1978.
Rehearing Denied in No. 77-3097 Aug. 28, 1978.
Rehearing Denied in No. 77-2944 Sept. 28, 1978.
 
 Barbara Lee Melvin (argued), Honolulu, Hawaii, for defendants-appellants.
 Thomas Morrison (argued), Honolulu, Hawaii, for plaintiff-appellee.
 On Appeal from the United States District Court for the District of Hawaii.
 Before MERRILL, CUMMINGS* and SNEED, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 In February 1977, defendant Karl Mowat was indicted for going upon a military reservation on the Hawaiian Island of Kahoolawe as prohibited by Instruction 5510.35[1] issued by the Commandant of the Fourteenth Naval District in San Francisco on January 14, 1976. This was said to violate 18 U.S.C. § 1382.[2] Subsequent criminal informations charged defendants Ritte, Sawyer, Chang, Warrington and Kauhane with similar violations. The alleged trespasses occurred in January and February 1977.
 
 
 2
 On April 22, 1977, defendants Kauhane and Warrington filed a motion to dismiss the information against them on the ground that Instruction 5510.35 had not been published in the Federal Register and therefore was not lawfully promulgated. They also asserted that the Instruction violated the Free Exercise clause of the First Amendment and the Due Process clause of the Fifth Amendment and that it does not apply to the beaches and trails on Kahoolawe Island. The other defendants joined in this motion but Judge King filed a decision and order denying it.
 
 
 3
 Five of the defendants received a bench trial before Judge Thompson commencing on June 21 and were convicted. Kauhane and Warrington were sentenced to 60 days' imprisonment, but their sentence was suspended and they were placed on probation for three years providing they pay a fine of $500 and not return to Kahoolawe without permission of the court. Ritte and Sawyer were each sentenced to six months' imprisonment and fined $500, and Chang was placed on probation for three years provided that she should pay a fine of $250 and not return to Kahoolawe without permission of the court.
 
 
 4
 Defendant Mowat's bench trial occurred before Judge Thompson on June 24, 1977. He also was convicted and received a six-months' prison term, with two months to be spent in a jail-type or treatment institution and the other four months suspended. In addition, he was placed on probation for three years and not allowed to return to Kahoolawe without the court's permission. We affirm all six convictions.
 
 
 5
 The Island of Kahoolawe is the smallest of the eight major Hawaiian Islands and comprises an uninhabited area of approximately 45 square miles. According to Judge King, this island was given by King Kamehameha III to the Hawaiian Kingdom as Government Land and was transferred to the United States upon annexation of the Hawaiian Islands in 1898. On February 20, 1953, President Eisenhower issued Executive Order 10436 placing the entire island under the jurisdiction of the Secretary of the Navy, except for 23.5 acres set aside for the Coast Guard for lighthouse purposes in 1928.[3] The Executive Order reserved this land for naval purposes and provided that when there was no longer a military need, notice should be given to the Territory of Hawaii and then upon request the area should be rendered "reasonably safe for human habitation" by the Department of the Navy. Since 1953, the island has been used for a target range.
 
 
 6
 On January 14, 1976, the Commandant of the Fourteenth Naval District in San Francisco issued COMFOURTEEN INSTRUCTION 5510.35 (Appendix Infra ) governing entry upon Kahoolawe Island. The Instruction observed that Kahoolawe was continuing to be used as a target area "for bombing and gunnery practice in order to maintain and improve combat readiness of the U. S. Armed Forces." The Instruction noted that there were large amounts of unexploded ordinance present on the island and in adjacent waters, so that inherently dangerous conditions probably existed in those areas. The Instruction restricted entry upon the island to authorized persons to prevent interruption of use of the island as a target area and to prevent injury to unauthorized persons. Citing 18 U.S.C. § 1382 (note 2 Supra ) and other references not pertinent here, the Instruction ordered that
 
 
 7
 "no person, other than military personnel and civilian employees of the United States in the performance of their official duties on Kahoolawe Island, shall enter or remain upon this island without advance consent of the Commandant, Fourteenth Naval District, or his authorized representative."
 
 
 8
 The Instruction then stated that any unauthorized person entering the island would be deemed to be in violation of 18 U.S.C. § 1382.
 
 
 9
 The Instruction was distributed through the military community, the local federal law enforcement agencies, and government departments within the State of Hawaii. It was also posted on Entry Prohibited signs on the island but was not published in the Federal Register. On an almost weekly basis, the Navy sent news releases to media sources throughout the state advising that entry on Kahoolawe was prohibited. The Navy also sent almost weekly notices to the director of the Fish and Game Division of the Hawaiian Department of Land and Natural Resources to the same effect. Consequently, the notification appeared in Fish and Game notices posted throughout Hawaii.
 
 
 10
 During 1976, there was considerable publicity given to Kahoolawe and its use by the Navy as a target complex through the Protect Kahoolawe Ohana organization ("Ohana"). There was also publicity about defendant Sawyer's April 1976 acquittal and Dr. Emmett Aluli's September 1976 acquittal for allegedly trespassing on Kahoolawe. (The grounds for those acquittals are not material here.) In 1976, they, defendants Mowat and Ritte and other Ohana members filed a civil suit against the Navy concerning its use of the island.
 
 
 11
 On January 30, 1977, defendants Ritte, Sawyer, Warrington and Kauhane entered Kahoolawe by boat at night and without advance consent. Warrington and Kauhane were picked up by marine helicopter on February 2, and Ritte and Sawyer were located and removed on March 5.
 
 
 12
 On February 6, 1977, defendant Mowat entered the island without consent by swimming part way at night. He was removed by helicopter on February 9.
 
 
 13
 On February 27, a marine helicopter spotted defendant Chang on a Kahoolawe beach without consent, and she was removed on the same date.
 
 
 14
 On appeal, the various defendants raise a number of arguments that can be consolidated into five groups: (1) the notice of the Instruction afforded the defendants violated the Administrative Procedure Act or due process; (2) conviction under Section 1382 requires specific intent; (3) the Instruction and the statute in prohibiting the defendants' conduct violate due process and the First Amendment; (4) the Navy had insufficient control and ownership over Kahoolawe to prevail under Section 1382; and (5) at least one of the defendants' conduct was justified under principles of necessity. Because of our conclusion that these arguments are without merit, the six convictions will stand.
 
 
 15
 I. The Notice Afforded Defendants Did not Violate the Administrative Procedure Act or Due Process
 
 
 16
 Because the violation for which they were punished was defined at least in part in an unpublished Instruction, defendants argue that their convictions violate the Administrative Procedure Act or the Due Process clause. In response, the Government offers two contentions, only the second of which we find persuasive: first, the Government argues that the Act does not require publication of the Instruction and alternatively it argues that defendants can be punished consistent with both the Act and the due process clause because they had actual knowledge of the prohibition against unauthorized entry upon
 
 
 17
 Kahoolawe. A. The Failure to Publish COMFOURTEEN INSTRUCTION
 
 5510.35 in the Federal Register
 
 18
 Admittedly COMFOURTEEN INSTRUCTION 5510.35 was not published in the Federal Register until January 4, 1978 (43 FR 785). The Administrative Procedure Act requires each agency to publish "substantive rules of general applicability" in the Federal Register (5 U.S.C. § 552(a)(1)(D)). The Government urges that this Instruction is not a substantive rule of general applicability, so that defendants may not take refuge in that portion of the Administrative Procedure Act which provides that a person may not be "adversely affected by, a matter required to be published in the Federal Register and not so published" (5 U.S.C. § 552(a)(1)). Both under its own regulations and under the applicable case law the Government's arguments are unpersuasive.
 
 
 19
 First, in implementing the requirements of the Administrative Procedure Act, the Department of the Navy has adopted in 32 C.F.R. § 701.56(b)(4)(i) the definition of "general applicability" contained in 1 C.F.R. § 1.1. In pertinent part, 1 C.F.R. § 1.1 defines "general applicability" as follows:
 
 
 20
 " 'Document having general applicability and legal effect' means any document issued under proper authority prescribing a penalty or course of conduct, conferring a right, privilege, authority, or immunity, or imposing an obligation, and relevant or applicable to the general public, members of a class, or persons in a locality, as distinguished from named individuals or organizations * * *."
 
 
 21
 As in United States v. Aarons, 310 F.2d 341, 345-346 (2d Cir. 1962), because the Instruction prescribes a "course of conduct" for "the general public" or "the persons of a locality" and therefore was of general applicability, publication was required by the Department's own rules.
 
 
 22
 While not explaining its possible conflict with 1 C.F.R. § 1.1 and 32 C.F.R.ss 701.56(b)(4) and 701.56(b)(4)(i),[4] the Government relies for a contrary conclusion on 32 C.F.R. § 701.56(b)(4)(iii) which excludes local regulations from publication in the Federal Register. This local exclusion provides as follows:
 
 
 23
 "As a normal rule, it is deemed unnecessary to publish in the Federal Register a regulation which is essentially local in its scope or application, such as a directive issued by a base commander in the implementation of his responsibility and authority under Subpart G of Part 700 of this title for guarding the security of the installation or controlling the access and conduct of Visitors or tradesmen. However, such publication of a local directive may be authorized where extraordinary justification exists, as determined by the Chief of Naval Operations or the Commandant of the Marine Corps, as appropriate, with the concurrence of the Judge Advocate General." (Emphasis supplied.)
 
 
 24
 On the other hand, 32 C.F.R. § 701.56(b)(4) requires the publication of "Substantive rules of general applicability" and § 701.56(b)(4)(i) adopts the definition of general applicability contained in 1 C.F.R. § 1 Supra.
 
 
 25
 Even assuming that the prohibition of defendants' activities could be described as implementing authority over "visitors or tradesmen" within the local exclusion despite the fact that, unlike visitors and tradesmen, persons asserting First Amendment rights would not be in normal contact with people on the base, the possible conflict between the local exclusion and 32 C.F.R. §§ 701.56(b)(4) and 701.56(b)(4)(i) should alone be enough to dictate disclosure in light of the purposes of the Act and the presumptions used in interpreting it. See generally Fisher v. Renegotiation Board, 153 U.S.App.D.C. 398, 473 F.2d 109 (1972).
 
 
 26
 In any case, subsection 32 C.F.R. § 701.56(b)(4) requiring publication of the Instruction is more consistent with the purposes of the Act, the protections of the due process clause and with previous decisions interpreting the scope of similar language. As the Government admits (Br. 15), the purpose of the Act is increased public awareness of Government rules, regulations and procedures. Of the many varied contexts in which such awareness is necessary or at least to be encouraged, it is hard to imagine a stronger case than when the unpublished rules define a criminal act. Cf. Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888.
 
 
 27
 Consistent with this preference for disclosure when any important interest is affected by the regulations, courts have held that a regulation is not one of general applicability within 5 U.S.C. § 552(a)(1)(D) if "(1) only a clarification or explanation of existing laws or regulations is expressed; and (2) no significant impact upon any segment of the public results." Lewis v. Weinberger, 415 F.Supp. 652, 659 (D.N.M.1976); See Hogg v. United States, 428 F.2d 274 (6th Cir. 1970), certiorari denied, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808. In Lewis Judge Bratton applied this standard and found that an interpretive memorandum excluding off-reservation Indians from contract health services was void for nonpublication because the memorandum caused a direct and significant impact upon the substantive rights of a segment of the public.
 
 
 28
 Seeking to avoid the application of Lewis to this case, the Government first attempts to limit its rule to "interpretive" regulations and argues that the regulation here was substantive. However, other cases have not limited publication to interpretive regulations (see Hogg, supra ), and if a distinction were to be drawn between the two types of regulations, substantive regulations, particularly those that define criminal conduct, should be published rather than an interpretive regulation that may only extrapolate on existing policies. Nor do we find persuasive the Government's attempted distinction from Lewis that here there was no direct impact on the defendants' rights because this Instruction is not an outright prohibition but only requires advance consent. The fact that establishing such a form of prior restraint may be a constitutionally permissible burden in this or some other case does not mean that requiring advance consent can be said to have no burden or impact at all on constitutional rights and thus excuse publication.
 
 
 29
 Because of our determination that the Instruction should have been published as a "Substantive rule of general applicability" (32 C.F.R. § 701.56(b)(4)) and more specifically as a document that prescribes a "course of conduct" (32 C.F.R. §§ 701.56(b)(4)(i) and 1 C.F.R. § 1.1), it is unnecessary to decide whether the Instruction itself, as opposed to 18 U.S.C. § 1382, prescribed a penalty and therefore should have been published under 32 C.F.R. § 701.56(b)(4) (i), or whether extraordinary circumstances within 32 C.F.R. § 701.56(b)(4)(iii) existed and required publication. However, as will be seen, the fact that the requirement of publication was not satisfied does not affect the prosecution of the defendants if they had actual knowledge of the prohibition contained in the
 
 
 30
 Instruction. B. The Actual Knowledge of the Prohibition
 
 Against Unauthorized Entry Upon Kahoolawe
 
 31
 The Administrative Procedure Act's requirement for publication of regulations in the Federal Register does not affect persons who have "actual and timely notice of the terms" of the regulation.[5] This language was added to the Administrative Procedure Act in 1967, so that our prior decision in Hotch v. United States, 212 F.2d 280, 14 Alaska 594 (9th Cir. 1954), is no longer persuasive. See generally Reich v. Webb, 336 F.2d 153, 159 n. 7 (9th Cir. 1964), certiorari denied, 380 U.S. 915, 85 S.Ct. 890, 13 L.Ed.2d 800; United States v. Monroe, 408 F.Supp. 270, 275-277 (N.D.Cal.1976), affirmed on other grounds, 552 F.2d 860 (9th Cir. 1977), certiorari denied, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1069. As Judge Friendly observed in Aarons, supra, "lack of publication should (not) be fatal when actual knowledge exists." 310 F.2d at 346.[6]
 
 
 32
 Defendants do not seriously contend that any notice to them was untimely and therefore in contravention of 5 U.S.C. § 552(a)(1).[7] Instead they place most emphasis on the argument that the Government must prove actual knowledge by direct evidence and that there was insufficient direct evidence of actual knowledge. Apparently the argument is that direct evidence should be required because defendants, having been deprived of the substantial protection of publication in the Federal Register, ought to receive the protective benefit that allowing only direct evidence would provide. However, the underlying premise of this argument is incorrect: as a practical matter, publication in the Federal Register is not so protective. See Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 387, 68 S.Ct. 1, 92 L.Ed. 10 (Jackson, J., dissenting). Second, and more importantly, insofar as defendants' argument is aimed at what Congress meant in using the phrase " actual and timely notice," it should be noted that actual notice consistently has been interpreted as allowing proof by either direct or circumstantial evidence. See Simmons Creek Coal Company v. Doran, 142 U.S. 417, 438, 12 S.Ct. 239, 35 L.Ed. 1063.[8] National Labor Relations Board v. Vapor Recovery Systems Company, 311 F.2d 782, 786 (9th Cir. 1962).
 
 
 33
 Because considerable circumstantial evidence of actual knowledge did exist, the district court's finding of actual knowledge on the part of all defendants cannot be held clearly erroneous. As to all the defendants, the Government and the district court note that the Instruction was posted on six to nine signs on the island and that entry restriction information in some form was contained in news releases and distributed to the major news disseminators in the State of Hawaii. Entry restriction information also was given to the State Director of Fish and Game for promulgation. Still other evidence showed the great publicity given to conditions respecting this island in 1976. While in the absence of additional proof such general background information may be insufficient as applied to an ordinary trespasser, these defendants were not ordinary trespassers. First, through the Ohana, at least some of the defendants clearly were involved in discussions with others who had focused their attention on the island, shared knowledge and interest in the island, and had been involved in prior civil and criminal cases regarding the island. In particular, in part through their membership in the Ohana, defendants Chang and Mowat both had seen at least some Navy communications or news reports about the island. Second, and more important, as discussed below, actions and statements by at least five of the six defendants provide a strong basis for inferring "actual and timely" knowledge of the relevant terms of the Instruction.
 
 
 34
 There was evidence to support the finding that Kauhane admitted that "at the time he set foot on the island" he knew he was trespassing. Similarly, Warrington admitted he heard entry of any sort was prohibited, and Mowat conceded that he was "aware that the Navy claimed that access to the whole island was illegal" (Br. 46).[9] While Ritte did not make a similar admission, Naval Captain Crockett testified that he attempted to give Ritte a letter barring his entry to the island and a copy of the Instruction in late April 1976, telling Ritte (T)his was a bar letter which confirmed the Commandant's Instruction that he should not go on the island" (Tr. 100). An inference of actual knowledge also can be drawn from the fact that three of the defendants, Ritte, Sawyer and Mowat, either asked for permission to go to the island or were present when such permission was requested. Counsel's admission at oral argument that defendants knew that the Navy had granted permission for religious ceremonies on the island in February 1976 provides a related indication of actual knowledge of the consent requirement.[10]
 
 
 35
 The foregoing evidence justifies Judge Thompson's finding:
 
 
 36
 "Insofar as the notice requirement is concerned, again taken in the light most favorable to the Government, this can be supplied and this is supplied by circumstantial evidence as to all five defendants (six including Mowat). It seems to the court that it can hardly be said that any one of these defendants, particularly and perhaps no one, no one on the island(s) except those who are in a status of absolute hermitage or seclusion would be unfamiliar with the regulations and the authority that the Navy has over the Island of Kahoolawe and notice requirement does not have to be face-to-face notice. It would be impossible for the Navy to disseminate notice to the world other than the manner in which they have done. If we were to require notice of the Navy to be mailed to every resident on every island or to be personally served on every resident on every island, that would be ludicrous before a trespass action could be brought by the Government for entry onto Kahoolawe * * * I find that there is sufficient evidence to show that these defendants in particular and perhaps many, many, many more particularly involved in this (Ohana) group or organization did have notice, have had notice for some period of time of the impermissibility to trespass on the Island of Kahoolawe without prior permission of the Navy." (6-22-77 Tr. 268-269)
 
 
 37
 "I find that all of these defendants had that requisite knowledge. Such knowledge may be inferred, as was stated in the Floyd case (477 F.2d 217), from all the facts and circumstances surrounding the case and the entry and the history and the motive and the political desires and religious desires of the individuals involved. All of that points clearly to notice as required. The facts and circumstances of and surrounding this case establish beyond a reasonable doubt that each of the defendants knew that the Navy prohibited any entry upon the Island of Kahoolawe." (6-23-77 Tr. 642-643)
 
 
 38
 Because this finding of actual notice is not clearly erroneous, the defendants' convictions are not proscribed by the Administrative Procedure Act or by the due process clause.
 
 II. Specific Intent
 
 39
 While defendant Mowat's argument that specific intent is necessary for conviction under 18 U.S.C. § 1382 receives some support from statements, concededly dicta, in Holdridge v. United States, 282 F.2d 302, 310 (8th Cir. 1960), the plain meaning of the statute combined with some of the factors laid out in Holdridge itself indicates that specific intent need not be proven. Not only does the statute not require intent on its face, but also it expressly includes anyone acting "for any purpose prohibited by law or lawful regulation." This phrase can be read in either of two ways, both of which support the Government's contention that intent is not required. On the one hand, the phrase could be read to mean that entry "prohibited by law or lawful regulation" is prohibited "for any purpose," clearly indicating a Congressional desire to make intent irrelevant. Alternatively, the statute could be read to prohibit entry "for any purpose prohibited by regulation," thus delegating the determination of prohibited purposes to the agency. Here the Instruction on its face prohibits entry regardless of purpose and the addition of a special penalty provision in the Instruction, not applicable here, which allows an increased penalty if a violation is wilful, clearly indicates that the Instruction as a whole was meant to prohibit entries regardless of wilfulness or intent. While it might be argued that as a type of a trespass, Section 1382 should be read to require intent because intent was required for a trespass at common law, the words of the statute again provide the answer in that the statute avoids the use of the word "trespass." Instead it proscribes "going upon" military property and is entitled with the word "entering" rather than with "trespassing." Arguably, if any inference based on a comparison with the common law is appropriate, it is that Congress sought to divorce this statute from the requirements of common law trespass. Cf. United States v. Flum, 518 F.2d 39, 43-44 (8th Cir. 1975).
 
 
 40
 Also significant in interpreting the meaning of the statute is the relatively light penalty attached to the prohibited conduct, a factor identified as significant by Holdridge. The maximum penalty for violation of Section 1382 is a $500 fine and six months' imprisonment. These misdemeanor penalties are less than half of others that have been held not to "gravely besmirch" and to be sufficiently small to indicate that no intent requirement was desired by Congress. Compare United States v. Flum, supra. Although this light penalty taken with the clear meaning of the statute makes a detailed analysis of the remaining complex Holdridge tests unnecessary, it is worth noting that the standard of conduct imposed by the statute, at least as applied to Kahoolawe and its use for gunnery and bombing practice, is not unreasonable. Thus we conclude that Congress clearly did not make motive or intent a factor in determining guilt, and on these facts the absence of Mens rea does not invalidate the statute. See United States v. Freed, 401 U.S. 601, 607-610, 91 S.Ct. 1112, 28 L.Ed.2d 356; United States v. Ayo-Gonzalez, 536 F.2d 652, 656-662 (5th Cir. 1976), certiorari denied, 429 U.S. 1072, 97 S.Ct. 808, 50 L.Ed.2d 789.
 
 
 41
 III. Constitutionality of Section 1382 and the Instruction
 
 
 42
 Defendants offer several related arguments seeking a determination that the statute and Instruction are unconstitutional. Initially they argue that the provisions violate their due process rights because they are impermissibly vague. In a related argument defendants contend that the absence of standards to guide the Commandant's discretion in granting permission to use the island violates either the Due Process clause or the First Amendment. Finally, Ritte, Sawyer, Kauhane and Warrington argue that the Instruction's limit on entry to the island is an unconstitutional restriction of their First Amendment freedoms.
 
 
 43
 The first argument, that the provisions are void for vagueness, apparently is based on the assertion that the Instruction and statute do not specify the boundaries of the Coast Guard portion of Kahoolawe. This contention is frivolous, for the Instruction provides that it applies only to the portion reserved for naval purposes under Executive Order No. 10436, and that Executive Order specifies the precise location of the lighthouse property being excluded from the Instruction. Taken together, the statute and the Instruction afford sufficient notice of what portions of Kahoolawe are covered.
 
 
 44
 More substantial is defendants' argument, characterized both as void-for-vagueness and under the First Amendment, that the Commandant's discretion under the statute and Instruction is not sufficiently guided and therefore can be exercised arbitrarily. Whatever the merits of this argument, it was not properly raised in this case because defendants did not apply to the Commandant for permission. Faced with a similar constitutional challenge and a similar failure to seek approval in Greer v. Spock, 424 U.S. 828, 840, 96 S.Ct. 1211, 1218, 47 L.Ed.2d 505, the Supreme Court responded:
 
 
 45
 "It is possible, of course, that Reg. 210-27 might in the future be applied irrationally, invidiously, or arbitrarily. But none of the respondents in the present case even submitted any material for review. The noncandidate respondents were excluded from Fort Dix because they had previously distributed literature there without even attempting to obtain approval for the distribution. This case, therefore, simply does not raise any question of unconstitutional application of the Regulation to any specific situation. Cf. Rescue Army v. Municipal Court, 331 U.S. 549 (67 S.Ct. 1409, 91 L.Ed. 1666.)"
 
 
 46
 Defendants Kauhane and Warrington correctly note that in Greer the petitioners had sought an injunction against the enforcement of the regulation and were not prosecuted for violating the challenged regulation as were the defendants here. Apparently the argument based on this distinction is that the prosecution itself places the application of the statute in issue. However, the fact that the defendants were prosecuted after failing to require permission does not mean that they would have been denied permission had they requested it.[11] Although the question might be phrased either as whether the defendants had standing to raise the argument or whether the Commandant's application was properly made an issue, the answer is the same. As in Greer, because the defendants did not give the Commandant an opportunity to apply the Instruction to them, there was no unconstitutional application in the case and as a result the constitutionality of his method of application cannot be contested.
 
 
 47
 Whether expressed as a denial of free exercise of religion or as a denial of freedom of speech, the essence of the defendants' First Amendment argument is that they have a constitutional right to hold a religious ceremony on the island. Although the Supreme Court cases seem inconsistent on whether access to Government property can be limited to "the use to which (the property) is lawfully dedicated" (Adderley v. Florida, 385 U.S. 39, 47-48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149; compare Id. and Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 with Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637), military bases appear to have been recognized as at least one location at which restrictions on the First Amendment activities of outsiders are permissible. See Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505. In Greer, the Supreme Court repeated the principle that a commanding officer may summarily exclude civilians from the area of his command. If he can do so as he did in Greer based on the hotly disputed justification of the separation of the military from political affairs, he certainly can take the lesser step of requiring advance approval for entry when his justification is that the land is needed as a target area and that inherently dangerous conditions exist on the island and in its adjacent waters.
 
 
 48
 The import of these justifications recently was reaffirmed in Aluli v. Brown, 437 F.Supp. 602 (D.Haw.), in which Mowat, Ritte, Sawyer, other individuals and the Ohana sued Government officials to enjoin bombing activities on the Island of Kahoolawe. In refusing to grant an injunction enjoining defendants from using live ordinance on Kahoolawe, Judge Wong's unreported opinion of September 15, 1977, stated (at p. 17):
 
 
 49
 "Defendants have testified that the military readiness of the Third Fleet would be reduced by 30 to 40 percent. Although no measurement standards were cited in arriving at these figures, the court finds that the reduction would nevertheless be substantial. Alternative sites were considered and rejected by defendants. The reasons given for their rejection seem reasonable. Considering the potential loss of military preparedness, this court finds that the balance of hardships tip decidedly toward the defendants."
 
 
 50
 See also U. S. Pacific Fleet Commander-in-Chief's Report on the Island of Kahoolawe, Passim (March 1976).[12]
 
 
 51
 Defendants' emphasis on the freedom of religion prong of the First Amendment rather than freedom of speech does not alter this result. See Bridges v. Davis, 443 F.2d 970 (9th Cir. 1971), certiorari denied, 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789. Even if it could be argued that the commanding officer's power to exclude civilians is inapplicable when those civilians assert religious as opposed to speech interests, the proper standard then would be to balance the burden placed on defendants' free exercise of religion against the Government's interests. Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965; Bridges v. Davis, supra. In light of the compelling Government interest at least in keeping outsiders off dangerous land, the public interest presently outweighs any burden on defendants' free exercise of religion.
 
 
 52
 IV. The Sufficiency of the Government's Possession of Kahoolawe
 
 
 53
 The parties agree that the Government was required to prove, as an element of the offense, absolute ownership or the exclusive right to the possession of the property upon which the violation occurred. Holdridge v. United States, 282 F.2d 302 (8th Cir. 1960); United States v. Packard,236 F.Supp. 585 (N.D.Cal.1964), affirmed, 339 F.2d 887 (9th Cir. 1964). The Government's claim of ownership here is based on a series of legal documents dealing with the island's status after King Kamehameha III gave it to the Hawaiian Kingdom in 1848 as Government Land.
 
 
 54
 In 1898, the United States accepted the cession by the government of Hawaii of the "absolute fee and ownership of all public, Government, or Crown lands, public buildings, or edifices, ports, harbors, military equipment, and all other public property of every kind and description belonging to the Government of the Hawaiian Islands, together with every right and appurtenance thereunto appertaining" (30 Stat. 750). Two years later, the Hawaiian Organic Act of 1900 provided that the public property ceded to the United States by Hawaii in 1898 should remain in the possession, use and control of the government of the Territory of Hawaii or be "taken for the uses and purposes of the United States by the direction of the president * * * ." 48 U.S.C. § 511. Twenty-three and three/tenths acres of Kahoolawe were taken for lighthouse purposes by presidential proclamation in 1928, and the remainder of the island was reserved for Navy purposes by President Eisenhower in 1953 until the Department of the Navy should notify Hawaii that there is no longer a need for the use of the island for naval purposes. See Executive Order No. 10436, Appendix Infra. The Hawaii Admission Act of 1959 confirmed the United States' sole and exclusive jurisdiction over military installations that had been set aside by the President. 73 Stat. 4, 5, 11-12. In pertinent part, that Act provides:
 
 
 55
 Sec. 16(b) "Notwithstanding the admission of the State of Hawaii, into the Union, Authority is reserved in United States, subject to the proviso hereinafter set forth, For the exercise by the Congress of the United States of the power of exclusive legislation, as provided in article I, section 8, clause 17, of the Constitution of the United States, In all cases whatsoever over such tracts or parcels of land as immediately prior to the admission of said State, are controlled or issued by the United States and held for Defense or Coast Guard purposes, whether such lands were acquired by cession and transfer to the United States by the Republic of Hawaii and set aside by Act of Congress or by Executive Order or Proclamation of the President or the Governor of Hawaii For the use of the United States, or were acquired by the United States by purchase, condemnation, donation, exchange, or otherwise: Provided (i) That the State of Hawaii shall always have the right to serve civil or criminal process within the said tracts or parcels of land in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed within the said State but outside of the said tracts or parcels of land; (ii) that the reservation of authority in the United States of the power of exclusive legislation over the lands aforesaid shall not operate to prevent such lands from being a part of the State of Hawaii, or to prevent the said State from exercising over or upon such lands, concurrently with the United States, any jurisdiction whatsoever which it would have in the absence of such reservation of authority and which is consistent with the laws hereafter enacted by the Congress pursuant to such reservation of authority; and (iii) that such power of exclusive legislation shall vest and remain in the United States only so long as the particular tract or parcel of land involved used for Defense or Coast Guard purposes: Provided, however, That the United States shall continue to have sole and exclusive jurisdiction over such military installations as have been delineated by the President of the United States and/or the Secretary of Defense." (Emphasis added.)
 
 
 56
 The subsequent Land Conveyance Act of 1963 recognized that the title of Kahoolawe is in the hands of the federal government and established procedures to transfer it to the State of Hawaii when it is no longer required by the United States. 77 Stat. 472, 472-473.
 
 
 57
 Based on these documents, Judge King correctly held that all of Kahoolawe except for the lighthouse portion was sufficiently under Government control. Apparently recognizing that on their face these documents provide sufficient Government control, the defendants first argue that at least the 1898 and 1900 agreements were invalid because they were made by "illegal revolutionaries." In light of Congress' recognition of the government of the Republic of Hawaii as the established government, the acceptance of the validity of the transfer agreements by both the United States and Hawaiian Supreme Courts (see United States v. Fullard-Leo, 331 U.S. 256, 270, 67 S.Ct. 1287, 91 L.Ed. 1474; Bishop v. Mahiko, 35 Hawaii 608 (1940)), and the failure of defendants to make a record on this argument below, we reject this challenge as frivolous. Nor are we persuaded that the land was immune from transfer and use by the Navy because it assertedly was held in public trust before the 1898 agreement. If any trust remained after the transfer, the agreements made it subject to the power of the President to reserve portions of the public domain for the United States for specified purposes. See generally Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331; United States v. Alaska, 423 F.2d 764 (9th Cir. 1970), certiorari denied, 400 U.S. 967, 91 S.Ct. 363, 27 L.Ed.2d 388.
 
 
 58
 In addition to insisting on the inadequacy of United States' possession at any time, defendants assert that the 1953 Executive Order (Appendix Infra ) and the 1959 Admission Act were conditioned upon a factual basis for continued need, which assertedly no longer exists. As to the Executive Order, on its face it makes an unconditional reservation of the island in the first paragraph and provides at the end that "when there is no longer a need" for the area, the Navy shall notify Hawaii and render the area safe for human habitation. Apart from the fact that the Navy apparently has reasonably concluded that the island is still needed (see Part III Supra ), the Executive Order does not support the claim that the United States loses title when its need for the island ceases. Ritte and Sawyer's argument that any Executive Order regardless of its terms expires when the emergency that precipitated it ends not only mischaracterizes this Executive Order as being based exclusively on the Korean War emergency but also ignores the fact that it only served to reserve for the Navy land that already was held by the United States. Defendants' reliance on Section 5(e) of the Admission Act is similarly misplaced because that Act plainly provides that the land should be reconveyed to Hawaii only after the President makes a discretionary decision that the land is no longer needed by the United States.[13] No such decision has been made. Therefore, while the use of an island of apparent religious significance as a bombing target may be regrettable, it cannot be blocked and these convictions cannot be overturned on the ground that the Government was without title to the island.
 
 
 59
 Judge King's decision and order with respect to the defendants' motion to dismiss also rejected their argument that title to the beaches and trails on Kahoolawe did not pass to the United States, As he pointed out, the Hawaiian Supreme Court ruled to the contrary in Bishop v. Mahiko, 35 Hawaii 608 (1940), where the court held that the entire dominion and sovereignty over the Hawaiian Islands passed to the United States under the Congressional Joint Resolution of 1898 and the Hawaiian Organic Act of 1900. Even if the Navy did not possess a fee simple absolute title to the Island of Kahoolawe, the maintenance of the "naval reservation" there suffices to support the convictions under 18 U.S.C. § 1382.
 
 V. Mowat's Defense of Necessity
 
 60
 Despite in effect denying the reasonableness of the entry prohibition in arguing that specific intent should be required (see Part II Supra ), Mowat insists that his offense should be excused on necessity grounds because he supposedly went to Kahoolawe to try to save his friends Ritte and Sawyer from impending bombing and to protect the island itself. However, the district judge simply did not believe that Mowat went to Kahoolawe for those purposes, and that determination is not clearly erroneous. Although Judge Thompson did not state expressly that Mowat was not intending to save his friends, he did find that Mowat went to Kahoolawe to protest the bombings (Tr. 718).
 
 
 61
 While that finding itself is a sufficient basis to reject the defense, the defense also could have been rejected as a matter of law. On the asserted justification of protecting property, we have held that "fear of injury to one's property * * * (does) not excuse an offense." D'Aquino v. United States, 192 F.2d 338, 358 (9th Cir. 1951), certiorari denied, 343 U.S. 935, 72 S.Ct. 772, 96 L.Ed. 1343; accord: United States v. Palmer, 458 F.2d 663, 665 (9th Cir. 1972). Although protection of the lives of others can be a proper basis for invoking the necessity defense, that justification is not applicable here. Even assuming that Mowat's actions were the result of sufficient compulsion (compare Kawakita v. United States, 343 U.S. 717, 736, 72 S.Ct. 950, 96 L.Ed.2d 1249, and D'Aquino, supra, with Model Penal Code § 3.02), the assertion of the necessity defense requires that optional courses of action appear unavailable. See W. LaFave & A. Scott, Criminal Law 387 (1972); United States v. Patrick, 542 F.2d 381 (7th Cir. 1976), certiorari denied, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775; cf. Regina v. Dudley and Stephens, LR 14 QBD 273 (1884).[14] Here Mowat made no attempt to secure consent to enter the island, nor did he take the simple step of notifying the officials on the island who could have notified Ritte and Sawyer more easily that Ritte and Sawyer might still be there.
 
 
 62
 The convictions are affirmed.
 
 
 63
 Judges MERRILL and SNEED concur in Judge CUMMINGS' opinion, save for part I.A. As to that part they express no opinion, being of the view that the issue there discussed need not be reached.
 
 
 64
 See Appendix on next page.
 
 
 65
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TABLE
 
 
 *
 The Honorable Walter J. Cummings, United States Circuit Judge of the Seventh Circuit, is sitting by designation
 
 
 [1]
 COMFOURTEEN INSTRUCTION 5510.35 is reproduced in the Appendix to this opinion
 
 
 [2]
 In pertinent part, 18 U.S.C. § 1382 provides:
 "Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation;
 "Shall be fined not more than $500 or imprisoned not more than six months, or both."
 
 
 [3]
 The lighthouse provision was pursuant to presidential proclamation No. 1827 dated February 3, 1928 (45 Stat. 2937)
 
 
 [4]
 32 C.F.R. § 701.56(b)(4) provides:
 "Substantive rules and policies. Substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the Department of the Navy. Such rules are commonly contained in directives, manuals, and memorandums."
 
 
 [32]
 C.F.R. § 701.56(b)(4)(i) provides:
 " 'General applicability' defined. The definition prescribed in 1 CFR 1.1 is pertinent to the classes of documents contemplated in § 701.56(b)(4)."
 
 
 [5]
 Section 552(a)(1) provides in part as follows:
 "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."
 By virtue of this provision, regulations that are unpublished in violation of the Administrative Procedure Act are unlawful only as against those who have no actual and timely knowledge of their contents. To construe the last clause of Section 552(a)(1) as making an unpublished regulation unlawful as applied to any defendant would render meaningless the proviso "except to the extent that a person has actual and timely notice of the terms thereof."
 
 
 [6]
 See also United States v. Floyd, 477 F.2d 217, 222 (10th Cir. 1973); National Labor Relations Board v. Chelsea Clock Co., 411 F.2d 189, 191 (1st Cir. 1969); Kessler v. Federal Communications Commission, 117 U.S.App.D.C. 130, 147, 326 F.2d 673, 690 (1963); United States v. Monroe, 408 F.Supp. 270, 276-277 (N.D.Cal.1976), affirmed on other grounds, 552 F.2d 860 (9th Cir. 1977), certiorari denied, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1069; 1 Davis, Administrative Law Treatise § 6.10 (1958); Comment, 68 Harv.L.Rev. 535, 536 (1955)
 Anderson v. Butz, 550 F.2d 459, 463 (9th Cir. 1977), is not contrary because there was no "timely notice" there as required by 5 U.S.C. § 552(a)(1).
 
 
 [7]
 The Instruction was issued on January 14, 1976, and defendants were found to have had actual notice of its purport before their entries upon Kahoolawe in January and February 1977. Therefore, any untimeliness argument would be frivolous
 
 
 [8]
 As observed in Simmons Creek Coal Company, supra at 438, 12 S.Ct. at 246, actual notice embraces evidence containing "the slightest circumstances from which * * * (the trier of facts) would be warranted in inferring notice."
 
 
 [9]
 The stipulation that defendant Mowat had no actual knowledge was clarified at trial by his counsel Clayton C. Ikei and Judge Thompson to mean only that he had not been handed a copy of the Instruction and had not sought permission nor been denied permission to enter Kahoolawe about February 6, 1977, when he went there (Tr. 653). In the companion case against the other five defendants, the Government had shown that they intended to go upon Kahoolawe for any purpose prohibited by lawful regulation, and Mowat stipulated to that evidence being admissible against him
 
 
 [10]
 As the Government has explained (Br. 44), the fact that the ceremony was labeled a "one-time ceremony" only meant that the Navy was not giving blanket permission for future ceremonies
 
 
 [11]
 We are not convinced that such an application would have been futile and therefore need not decide whether proof of futility would properly raise the issue. Cf. Glover v. St. Louis-San Francisco R. Co., 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519. The record does not show that there would be a blanket refusal to enter the island. Rather, the testimony shows that the Navy considers each request individually and weighs it against current operations there. The Instruction itself shows that consent should be withheld if persons would be injured by unexploded ordinance or bombing and gunnery practice (Pars. 3a and 3b). Arguably this part of the Instruction and the foregoing testimony also reveal a standard used by the Commandant in weighing applications
 
 
 [12]
 This Report shows that: the United States needs Kahoolawe for military purposes for the foreseeable future, the entire island (except for the lighthouse acreage) is used as a target complex, unexploded ordinance is present throughout Kahoolawe, and the whole island is hazardous
 
 
 [13]
 In pertinent part, Section 5(e) of the Admissions Act provides:
 " * * * each Federal agency having control over any land or property that is retained by the United States pursuant to subsection (c) and (d) of this section shall report to the President the facts regarding its continued need for such land or property, and if the President determines that the land or property is no longer needed by the United States it shall be conveyed to the State of Hawaii" (73 Stat. 6).
 
 
 [14]
 Mowat claims that the necessity defense is judged on a subjective standard and that therefore his belief of necessity is enough. Arguably such an interpretation of the defense is inconsistent with its rationale of balancing the value of the harm to society that is avoided against the harm done to society. See W. LaFave & A. Scott, Supra. Even the Model Penal Code's broad definition of the necessity defense recognizes that the defense is inappropriate if the defendant is "reckless or negligent * * * in appraising the necessity of his conduct." Model Penal Code § 3.02