**Arthur LEWIS, Plaintiff,**

v.

**Caspar WEINBERGER, Secretary of Hew, et al., Defendants.**

**Gwendolyn LEWIS, Plaintiff,**

v.

**Caspar WEINBERGER, Secretary of Hew, et al., Defendants.**

**Civ. Nos. 74–524–b, 74–526–B.**

United States District Court, D. New Mexico.

May 27, 1976.

---

Thomas E. Luebben, Jr., Native American Legal Defense & Ed. Fund, Inc., Albuquerque, N.M., for plaintiffs.

Ruth C. Streeter, Asst. U. S. Atty., Albuquerque, N.M., for defendants.

## AMENDED MEMORANDUM OPINION

BRATTON, District Judge.

This action is brought to challenge the validity of the procedure by which the Indian Health Service (IHS) distributes contract medical care. Specifically, plaintiffs attack the IHS policy and practice, as followed in the Albuquerque Area, of denying contract medical care to off-reservation Indians.

The expenditure of federal funds for the conservation of Indian health is authorized by the Snyder Act of 1921. 25 U.S.C.A. § 13 (1974).[1] At present, health care is provided to American Indians and Alaskan Natives by the IHS, which is a part of the United States Public Health Service, Department of Health, Education and Welfare (HEW).[2]

The Secretary of HEW has promulgated regulations which govern the delivery of medical care by the IHS, and these regulations are codified at 42 C.F.R., Part 36—Indian Health (1975).[3] Administrative instructions concerning the day-to-day operations of the IHS are compiled in the Indian Health Service Manual, a public document available at IHS offices.[4]

The IHS has sought to meet its Indian health care responsibility, in part, by maintaining its own Service Units, including clinics and hospitals, in various areas of the

---

1. The Snyder Act directs the Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, to "expend such moneys as Congress may from time to time appropriate for the benefit, care, and assistance of the Indians throughout the United States for the following purposes:

    For . . . Conservation of Health.

    For the employment of . . . physicians . . . ."

2. In 1954, Congress transferred the responsibility for Indian health care from the Bureau of Indian Affairs to the Surgeon General of the United States Public Health Service, under the supervision and direction of the Secretary of Health, Education, and Welfare. Act of Aug. 5, 1954, Pub.L. No. 83–508, § 1, 68 Stat. 674 (codified at 42 U.S.C.A. § 2001 (1974), *as amended,* 42 U.S.C.A. § 2001(a) (Supp.1976). 1966 Reorg. Plan No. 3 transferred all functions of the Surgeon General to the Secretary of Health, Education, and Welfare. 31 F.R. 8855, 80 Stat. 1610.

3. The regulations governing the provision of Indian health care were promulgated pursuant to 42 U.S.C.A. § 2003 (1974).

4. The adoption of IHS administrative instructions is authorized at 42 C.F.R. § 36.1(b) (1975).

United States where substantial numbers of Indians live.[5] Further, certain specialized medical services which are not provided by the IHS Service Units have been made available at non-Indian or outside facilities under contract to the IHS. Health care provided by IHS employees at IHS facilities is called direct care, and the label contract care describes those health services performed at outside facilities pursuant to an arrangement with the IHS.

Criteria have been prescribed for identifying those persons to whom IHS medical care is available. According to the HEW regulations, a person is within the scope of the Indian health and medical service program if: (1) he is of Indian descent; and (2) he belongs to the Indian community served by the local IHS facilities and program.[6] The Indian Health Service Manual prescribes general health care eligibility re-

quirements similar to those found in the regulations.[7]

The regulations and the Indian Health Service Manual contain provisions concerning eligibility for contract care, in particular. The regulations state that the availability of contract services to individual Indian beneficiaries will be governed by the terms of the contract. 12 C.F.R. § 36.21 (1975). The pertinent IHS administrative instruction indicates that contract services are available to those who satisfy the eligibility requirements for IHS care in general.[8]

The regulations and the Indian Health Service Manual set forth criteria for developing priorities to be followed in allocating limited funds, facilities or personnel for Indian health care. As among individuals within the scope of the program, the regulations state that care and treatment priori-

---

**5.** In organizing a health care program the IHS geographically divided the United States into Indian Health Areas and subdivided these Areas into Service Units. For example the Albuquerque Indian Health Area, covering New Mexico, includes a number of discrete Service Units within the state. Indian Health Service Manual, Part 1, Ch. 4.

**6.** The regulations which address eligibility for IHS care provide, in pertinent part:

Persons to whom services will be provided.
(a) In general. (1) Services will be made available, as medically indicated, to persons of Indian descent belonging to the Indian community served by the local facilities and program, and non-Indian wives of such persons.
(2) Generally, an individual may be regarded as within the scope of the Indian health and medical service program if he is regarded as an Indian by the community in which he lives as evidenced by such factors as tribal membership, enrollment, residence on tax-exempt land, ownership of restricted property, active participation in tribal affairs, or other relevant factors in keeping with general Bureau of Indian Affairs practices in the jurisdiction.
42 C.F.R. § 36.12 (1975).

**7.** The pertinent IHS administrative instruction reads:
PERSONS TO WHOM SERVICES MAY BE PROVIDED
A person may be regarded as within the scope of the Indian Health program if he is not otherwise excluded therefrom by provision of law, and:

A. Is of Indian and/or Alaskan Native descent as evidenced by one or more of the following factors:
(1) Is regarded by the community in which he lives as an Indian or Alaska Native,
(2) Is a member, enrolled or otherwise, of an Indian or Alaska Native Tribe or Group under Federal supervision,
(3) Resides on tax-exempt land or owns restricted property,
(4) Actively participates in tribal affairs,
(5) Any other reasonable factor indicative of Indian descent; or
B. Is an Indian of Canadian or Mexican origin recognized by any Indian tribe or group as a member of an Indian community served by the Indian Health program; or
C. Is a dependent (Indian or non-Indian) of a person qualifying under A or B above, and resides in the household of such qualifying person.
Indian Health Service Manual, Part 2, Ch. 1, § 2–1.2.

**8.** The Indian Health Manual's chapter on contract patient care contains the following provision:
BENEFICIARIES TO BE SERVED
The PHS Regulations (36 CFR 12) and Part 2, Chapter 1 of this manual set forth generally those individuals who come within the scope of the Indian health program. Indian Health Service Manual, Part 2, Ch. 3, § 2–3.6. The regulations and Manual provisions generally identifying individuals within the scope of the Indian health program are set out at notes 6 and 7, *supra*.

ties are to be based on (1) relative medical need and (2) access to other arrangements for obtaining the necessary care. 42 C.F.R. § 36.12 (1975). The IHS administrative instructions indicate that considerations similar to those set forth in the regulations should govern the determination of priorities for both direct and contract care.[9]

Under the IHS policy, as stated in the Indian Health Manual, the responsibility for authorizing or denying contract health care services rests with the Area in which services are rendered. Further, the same policy which is applied to Indians within the Area is to be applied to Indians from another Area.[10]

Plaintiff Arthur Lewis is a full-blood, enrolled member of the Choctaw Tribe of Indians from Oklahoma. Plaintiff Gwendolyn Lewis, his wife, is a full-blood, enrolled member of the Wichita Tribe of Indians from Oklahoma. Arthur and Gwendolyn Lewis have lived at Taos, New Mexico, within two miles of the Taos Indian Reservation since 1961. Mr. and Mrs. Lewis are members of federally recognized Indian Tribes, and it has been stipulated that they are fully eligible under the Snyder Act and rules and regulations promulgated thereunder to receive health care from the IHS. *Direct* medical services have been and continue to be provided to Mr. and Mrs. Lewis at the Santa Fe Service Unit of the IHS. It has been stipulated that persons of Indian descent who present themselves at IHS facilities and identify themselves as members of federally recognized Indian and Alaskan Native communities are eligible to receive direct care at IHS units.

In 1967, it was determined that Arthur Lewis suffered from Hodgkins disease, a form of cancer. In 1967 and in 1968, pursuant to then existing policy, the Albuquerque Area office of the Indian Health Serv-

9. The administrative instruction containing a general statement of priority guidelines follows:

*Guidelines for Priorities.* All services available at any IHS facility will be provided as needed to any person within the scope of the program who presents himself at that facility and for whom the IHS facility is more accessible than other programs and resources. Services needed but not available at the IHS facility will be provided through the Contract Medical Care program depending upon:
(1) The person's medical need, determined by a physician whenever possible.
(2) The actual availability and accessibility of alternate resources.
(3) The financial resources available to the Service facility at that time.
(4) His personal resources.
Indian Health Service Manual, Part 2, Ch. 1, § 2–1.5B.

The Manual's chapter on contract patient care sets out a more specific instruction on contract care priorities, as follows:
PRIORITIES FOR MEDICAL CARE SERVICES
A. *Establishment of Priorities by Medical Officer in Charge.* Contract medical care services will be provided Indians coming within the scope of the Division of Indian Health program in accordance with priorities as established by the appropriate Medical Officer in charge according to Part 2, Chapter 1, Section 5B of this manual.
B. *Factors to Consider in Establishing Priorities.* The following factors shall be considered in the establishment of priorities for medical care services under the Contract Patient Care program:
(1) Need for emergency services which cannot be provided at a Division of Indian Health facility.
(2) Elective medical care services in service units where direct Division of Indian Health facilities are not available.
(3) Need for essential medical services in service units where direct Division of Indian Health services are not available.
(4) Need for essential supportive medical services not available in Division of Indian Health facilities.
(5) Need for specialized medical services to meet specific needs of Indians in order to raise their health status to that of the nation as a whole.
Indian Health Service Manual, Part 2, Ch. 3, § 2–3.7.

10. The Indian Health Manual contains the following policy statement:

Persons within the scope of the Indian Health program in one area will be provided available medical and/or other related services by any other area in which they may require health services. The authorization or denial of Contract Health services shall be the responsibility of the Area in which the services are rendered. The Area in which the services are rendered shall apply the same policies and have the same notification requirements for persons from other Areas as are applied to those persons within the Area. Indian Health Service Manual, Part 2, Ch. 1, § 2–1.3C.

ice expended its contract care funds to pay for specialized cancer treatments provided to Mr. Lewis at non-IHS facilities. Though Mr. Lewis' cancer is now in remission, it cannot be considered cured.

Gwendolyn Lewis began to suffer internal hemorrhaging from the uterus on or about January 15, 1973. She was admitted to the IHS hospital in Santa Fe, New Mexico, where she received direct medical care for three weeks. At the end of three weeks, plaintiff's condition had seriously deteriorated, and her IHS attending physician rushed her to St. Vincent Hospital in Santa Fe, a non-IHS facility, for emergency surgery necessary to save her life. Because Mrs. Lewis had received IHS-funded contract services in the past, she believed that IHS would pay for her treatment at St. Vincent. After surgery, however, she was informed that she would have to pay the cost. Neither Gwendolyn nor Arthur Lewis can afford to pay the still outstanding balance of the hospital's bill.

By letter dated April 25, 1973, Mr. and Mrs. Lewis were informed by the Albuquerque Area Office of the IHS that they are no longer eligible to receive IHS contract health care for the reason that they are considered so-called off-reservation Indians.

The denial of contract care to Mr. and Mrs. Lewis results from a relatively recent change in IHS policy with regard to contract health care. Under present policy, the IHS, in effect, defines two classes of Indians eligible to receive medical services under the Snyder Act. One class, designated reservation Indians, is considered eligible to receive both direct care and contract care. The other class, designated off-reservation Indians, is considered eligible to receive direct care only.

Neither the distinction between reservation and off-reservation Indians nor the policy-rule that off-reservation Indians are ineligible to receive contract care appears in the relevant statutes, the applicable regulations, or in the Indian Health Manual. The only formal and official statement of present IHS contract care policy is contained in a memorandum called "Clarification and Explanation of IHS Policy on contract Health Services." This memorandum, available at IHS offices, was dated April 18, 1973, and was sent from the IHS Director to Headquarters Staff Offices, Area Directors, and Program Officers of the IHS and to National Indian Health Board members. The operative portion of the memorandum reads as follows:

"Many Indian people choose to leave those areas in which IHS health services delivery systems are maintained, to make their homes in places where health resources and programs serving the general public are located and are accessible to the Indian people on the same basis as to other citizens. Therefore, under the present level of contract funding, such Indians are not provided with services which require the expenditure of contract health funds, since they have access to alternative health resources and programs on the same basis as anyone else. This is necessary to conserve funds for contract health services to those who live in the areas served by the IHS health services delivery systems. However, should Indian people who have moved beyond the areas served by the IHS health services delivery systems choose to seek care at an IHS facility, they will receive care to the extent that the facilities, staff, and physical plant can provide it."

The foregoing statement of policy has been widely implemented in various IHS Area Offices throughout the country. However, the definitions of reservation and off-reservation Indians, for purposes of identifying those who are and are not eligible for contract health care, differ radically from Area to Area.[11]

11. Letters from IHS Area Offices reveal the range of inconsistency. For example, in the Portland, Oregon Area, the definition of an off-reservation Indian would include any one who lives in a place other than an Indian reservation, other trust land, or traditional Indian community. Further, an Indian from a New Mexico tribe who maintained a permanent residence on a reservation within the Portland Area would be eligible for contract care there. In

It is uncontroverted that under the policy of the Santa Fe Service Unit, which is within the Albuquerque Area of the IHS, only the following categories of persons are eligible to receive contract care: (1) enrolled members of one of the fourteen tribes served by the Santa Fe Service Unit who live on or in close proximity to their reservations; (2) full-time advanced students and their dependents attending schools within the Santa Fe Service Unit who are eligible for contract health services at their home area; and (3) transient Indians who require emergency services and are eligible for contract health services at their home area.

A response to an interrogatory issued by plaintiffs in this lawsuit indicates that it is IHS policy to provide contract health services only to reservation Indians. The response indicates that the IHS defines reservation Indians as persons of Indian descent who are members of a federally recognized tribe and (1) who reside on a reservation belonging to the tribe of which the Indian is considered to be a member, or in federally recognized Indian, or Alaskan Native, communities in traditional Indian country in Oklahoma or in Alaska of which the Indian is considered to be a member and (2) who live near a federal Indian reservation or federally recognized Indian or Alaska Native communities in traditional Indian country in Oklahoma or Alaska and who maintain close economic and social ties with such reservation or community in accordance with Subpart B of Part 36, 42 C.F.R. Off-reservation or urban Indians are defined as Indians who do not fall within the definition of reservation Indians.

It is a fair inference from the record that the immediately preceding statement of IHS contract care policy and the accompanying definitional eligibility tests are fol-

lowed in the Albuquerque Area of the IHS. Further, with regard to the availability of contract care funds to Indians residing within the Albuquerque Area, the following practices are fairly inferrable from the record: (1) any Indian from a New Mexico tribe is considered a reservation Indian, regardless of where he resides in the state; and (2) any Indian from an out-of-state tribe is considered an off-reservation Indian regardless of where he resides in the state.

Mr. and Mrs. Lewis have brought suit to challenge the eligibility standards of the IHS contract care program on behalf of themselves and on behalf of all off-reservation Indians in New Mexico, as that class was defined in response to plaintiff's interrogatory. (See above).

Named as defendants in this action are Caspar Weinberger, who, as Secretary of HEW, has authority over IHS policy and practices; Emory Johnson, director of the IHS; and Kazumi Kasuga, director of the Albuquerque Area Regional Office of the IHS. Jurisdiction is invoked pursuant to 28 U.S.C.A. § 1331, 28 U.S.C.A. § 1337, 28 U.S.C.A. § 1361, and 5 U.S.C.A. § 702.

This matter is before the court on the parties' cross-motions for summary judgment. The court has determined that there are no genuine issues of material fact in the case and, therefore, that it is appropriate for resolution by summary judgment.

Plaintiffs seeks a declaratory judgment that the IHS policy of denying contract medical services to Indians otherwise eligible to receive health care under the Snyder Act (1) exceeds and contradicts defendants' statutory authority, (2) violates regulations and instructions governing defendants' activities, and (3) infringes plaintiffs' constitutional rights to due process and equal protection of the laws. Also requested is a declaratory judgment that the IHS rule

the Billings, Montana Area, an off-reservation Indian is defined as one living outside the boundary of a Service Unit Area. An Indian from a tribe outside the State living on a Montana reservation would be eligible for contract care in the Area. The Oklahoma City, Oklahoma, Area IHS defines off-reservation Indians as those living outside their health care delivery

system or in Oklahoma City or Tulsa, Oklahoma. A New Mexico Indian residing within the Oklahoma health care delivery system would be eligible for contract care on the same basis as Oklahoma Indians, provided he were within the scope and priority of his home Area's contract health care program.

which denies contract care to off-reservation Indians is invalid because it has not been promulgated and published as required by the Administrative Procedure Act (A.P.A.). In addition, plaintiffs ask for injunctive relief to prevent the IHS from denying contract care to any otherwise eligible Indian on the ground that he is an off-reservation Indian. Mrs. Lewis seeks payment of the outstanding balance of $198.90 for her care at St. Vincent Hospital.

The position generally advanced by the IHS is that the distribution of contract medical funds is a discretionary function delegated to the Secretary of HEW to be performed to conserve Indian health within the limits of congressional appropriations. The IHS contends that Congress has not created a legal entitlement to medical services on behalf of all Indians and that the apportionment of Indian health care funds is a matter committed to administrative discretion.[12] It is asserted that the discretion exercised by the IHS in establishing the disputed priorities for Indian health care is neither arbitrary, capricious, nor unreasonable.

Turning first to plaintiffs' procedural challenge, it is claimed that the IHS policy rendering off-reservation Indians ineligible for contract care has been implemented in violation of provisions of the A.P.A.

As mentioned before, the 1973 memorandum called "Clarification and Explanation of IHS Policy on Contract Health Services" is the basic official statement of present IHS contract care policy. It embodies a policy previously established throughout the IHS by oral or other unwritten or unpublished instruction. This memorandum, which purports to exclude from eligibility for contract care "Indian people who choose to leave those areas in which IHS health delivery systems are maintained, . . ." has not been published in the Federal Register. The operative portion of the memorandum has been interpreted by Area Offices and Service Units as excluding a variously defined class of off-reservation Indians from contract care benefits, although the words of the memorandum itself only exclude Indians who actually live outside the boundaries of the Service Unit Areas.*

It is the Court's conclusion that the IHS policy which excludes off-reservation Indians from eligibility for contract care is ineffective for lack of publication in the Federal Register, as required by the public information provisions of the A.P.A., and for lack of issuance in accord with A.P.A. rulemaking procedures. Thus, administrative determinations based on this policy are invalid.

The public information provisions of the A.P.A. require, in part, that:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

.        .        .        .        .

.        .        .        .        .

.        .        .        .        .

(D) Substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency. 5 U.S.C.A. § 552(a)(1)(D) (1967).

---

12. In support of this position, the government cites the following provisions concerning the scope of the HEW regulations on Indian health:

Purpose and effect.

(a) The regulations in this part establish the general principles to be followed in the discharge of this Department's responsibilities for continuation and improvement of the Indian health services. Officers and employees of the Department will be guided by these policies in exercising discretionary authority with respect to the matters covered.

(b) The Surgeon General of the Public Health Service is authorized to adopt, and from time to time revise or add, administrative instructions relating to methods or procedures appropriate to implementing these principles, or for their supplementation as to matters not covered, including instructions providing for the continuation or appropriate modification of practices and procedures previously observed in the provision of Indian health services in particular jurisdictions. 42 C.F.R. § 36.1 (1975).

* Mr. and Mrs. Lewis live within the boundaries of the Taos Service Unit.

HEW, the federal agency under which the IHS is administered, has, in effect, incorporated into its regulations, a significant number of the A.P.A. public information provisions, including 5 U.S.C.A. § 552(a)(1)–(2) (1967), *as amended* 5 U.S.C.A. § 552 (Supp.1976). 45 C.F.R. § 5.13 (1975).

The IHS contract care policy in dispute should have been published in the Federal Register. It falls within the scope of "statements of general policy or interpretations of general applicability formulated and adopted by the agency" under 5 U.S. C.A. § 552(a)(1)(D) (1967).[13] In reaching this conclusion, the Court has taken into account the provisions of section 552(a)(2) dictating that "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register" need only be available for public inspection and copying. 5 U.S.C.A. § 552(a)(2)(B) (Supp.1976).

In determining whether particular policy or interpretive statements are required to be published or whether they need only be made available, subsections (a)(1) and (a)(2) of section 552 must be read together: " 'statements of policy' must be available and 'statements of general policy' must be published; 'interpretations which have been adopted by the agency' must be available and 'interpretations of general applicability' must be published." K. Davis, Administrative Law Treatise § 3A.7 (Supp.1970) [hereinafter cited as Davis].

A policy statement is not qualified as "general" nor is an administrative interpretation deemed to be "of general applicability" if: (1) only a clarification or explanation of existing laws or regulations is expressed; and (2) no significant impact upon any segment of the public results. *See Hogg v. United States,* 428 F.2d 274 (6th Cir. 1970); *Anderson v. Butz,* 37 Ad.L.2d 852 (E.D.Cal.1975). *See generally* Davis §§ 3A.7, .9. Therefore, such material need not be published. Also within the availability requirement of 552(a)(2)(B) are statements affecting only an agency's internal or housekeeping operations and adjudicatory opinions which may be relied upon as precedents by the agency. *See Hogg v. United States, supra* ; Davis §§ 3A.7, .9.

"Statements of general policy or interpretations of general applicability" which fall within the publication requirement of section 552(a)(1) have been variously defined.[14] Generally, however, policy or interpretive statements are deemed to fall within the scope of 552(a)(1)(D), requiring their publication, when they adopt new rules or substantially modify existing rules, regulations, or statutes and thereby cause a direct and significant impact upon the substantive rights of the general public or a segment thereof. *See Anderson v. Butz, supra.*

The IHS memo serves as the present authorization for excluding off-reservation Indians from the class of beneficiaries eligible for contract health care. As such, it is a "statement of general policy" within the meaning of 552(a)(1)(D).[15]

**13.** A.P.A. section 552(a)(1) may require publication in a given case regardless of whether the rule-making procedures prescribed in section 553 are applicable to such case. *See Pesikoff v. Secretary of Labor,* 163 U.S.App.D.C. 197, 501 F.2d 757, 763, 64 n. 13 (1974); *Rodriguez v. Swank,* 318 F.Supp. 289, 295 (N.D.Ill.1970), *aff'd,* 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971).

**14.** The United States Court of Appeals for the Fourth Circuit has declared that in order to be within the A.P.A. requirement of publication in the Federal Register, "a step in the agency's operation must affect private or public interests . . . directly . . . It must, too, be of such a nature that knowledge of it is needed to keep the outside interests informed of the agency's requirements in respect to any

subject within its competence, as a guide in the conduct of their day-to-day affairs, and to instruct them in regard to the presentation to the agency of any such subject for impartial consideration or action thereon." *United States v. Hayes,* 325 F.2d 307, 309 (4th Cir. 1963).

In *Hogg v. United States, supra* at 280, the Sixth Circuit stated, "Under the provisions of 5 U.S.C. § 552, the requirement for publication attaches only to matters which if not published would adversely affect a member of the public."

**15.** Where the substance and effect of a particular policy pronouncement is such that A.P.A. section 552(a)(1) requires its publication in the Federal Register, the publication requirement cannot be avoided by means of the format in which the pronouncement is couched or the

The contested IHS policy effects a substantial modification of the existing statutes, rules and regulations governing Indian health care. The pertinent regulatory authority prescribes criteria to be used in determining eligibility for Indian health services in general. Neither the regulations nor the provisions of the Indian Health Service Manual state that eligibility for contract health care is to be determined on a different basis than eligibility for IHS care in general.[16] Thus, the controlling statutory and regulatory authority does not eliminate off-reservation Indians from eligibility for IHS health care in general or contract care in particular. In fact, it has been conceded that plaintiffs, off-reservation Indians, are fully eligible under the Snyder Act and the rules and regulations promulgated thereunder to receive health care from the IHS. They have received contract services from the Albuquerque Area in the past, and they continue to receive direct care.

The regulations and Indian Health Services Manual provisions do authorize the IHS to develop priorities for allocating limited funds, facilities, and personnel to Indian health care needs in general. Relative medical need and access to alternative care arrangements are the basic criteria prescribed for developing direct or contract care priorities among individuals within the program's scope.

With regard to the availability of contract care, the contested IHS policy may be viewed as affecting eligibility requirements or priority considerations. From either viewpoint, its effect is to substantially modify pre-existing authority by denying to otherwise eligible Indians consideration for contract care services.[17]

The modification accomplished by the contested IHS policy pronouncement resulted in a direct and significant impact upon the substantive rights of a segment of the general public. It had a pervasive, exclusionary effect upon the right to consideration for contract care of all Indians within the scope of the IHS program according to criteria set forth in the regulations, but susceptible to classification as off-reservation under the policy in question. Further, the plaintiffs' right to consideration for contract care benefits, the right affected by the policy in dispute, is a significant substantive right. *See Memorial Hospital v. Maricopa County,* 415 U.S. 250, 259, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1973).

In a case involving facts strikingly similar to those now before this Court, the United States Supreme Court discussed an agency's responsibility in creating reasonable classifications and eligibility requirements to aid in allocating limited funds for Indian welfare services. *Morton v. Ruiz,* 415 U.S. 199, 230–31, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1973). The rationale underlying the publication requirement was succinctly expressed, as follows: ". . . the agency must, at a minimum, let the standard be generally known so as to assure that it is being applied consistently and so as to avoid both the reality and the appearance of arbitrary denial of benefits to potential beneficiaries." *Id.* at 231, 94 S.Ct at 1072. In this case, publication of the contested IHS policy is necessary not only to avoid the "reality and appearance of arbitrary denial of benefits" but also to guide

label, for example, "administrative instruction," attached to it by the promulgating agency. *Piercy v. Tarr,* 343 F.Supp. 1120, 1128 (N.D.Cal.1972).

**16.** The regulations state that the availability of contract services to individual beneficiaries will be governed by the terms of the contract. 12 C.F.R. § 36.21 (1975). Since no contract has been placed before the court, it is assumed that the contract's provisions are consistent with those of the regulations.

**17.** The Memo's IHS policy statement has been implemented in the Albuquerque Area in a manner which, as among Indians residing in New Mexico, in effect, disfavors members of out-of-state tribes for treatment as reservation Indians. *See* discussion on pp. 656–657. Thus, the contested IHS policy, as implemented in New Mexico, contradicts an existing IHS pronouncement that the same policy which is applied to Indians within the Area is to be applied to Indians from another Area. Indian Health Service Manual, Part 2, Ch. 1, § 2–1.3B.

the legitimate expectations of that segment of the Indian public whose substantive rights are affected.[18]

The contested contract care policy is procedurally deficient not only for lack of publication in the Federal Register under section 552(a)(1)(D) but also because the A.P.A. rulemaking procedures were not followed by the IHS in its issuance. The A.P.A. rulemaking scheme generally requires that an agency's adoption of new rules be attended by: advance notice of proposed rulemaking published in the Federal Register; opportunity for interested persons to participate and submit views to the agency; and a statement by the agency as to the rules' basis and purpose. 5 U.S.C.A. § 553 (1967). Exempt from these general notice and comment requirements are "interpretive rules" and "general statements of policy." 5 U.S.C.A. § 553(b)(A) (1967). Also, section 553, by its own terms, exempts from its procedural requirements matters "relating to . . . public property, loans, grants, benefits or contracts." 5 U.S.C.A. § 553(a)(2) (1967).

The IHS policy in question was subject to the general notice and comment requirements of section 553 since no exemptions were applicable. The policy in question effects a substantial change in existing statutes and regulations, and it has a direct and significant impact upon the substantive rights of a segment of the general public. See pp. 659–660 supra. Under these circumstances, the IHS policy statement was not exempt from A.P.A. rulemaking requirements as an "interpretive rule" or a "general statement of policy" within the meaning of section 553(b)(A). See Morton v. Ruiz, supra at 236, 94 S.Ct. 1055; Texaco v. F.P.C., 412 F.2d 740 (3rd Cir. 1969); Anderson v. Butz, supra; Nader v. Butterfield, 373 F.Supp. 1175 (D.D.C.1974); Continental Oil Co. v. Burns, 317 F.Supp. 194 (D.Del. 1970); Pharmaceutical Mfr's Ass'n v. Finch, 307 F.Supp. 858 (D.Del.1970). Further HEW, the agency of which the IHS is a

part, has placed itself under the procedural requirements of section 553 in all its rulemaking relating to "public property, loans, grants, benefits or contracts." 36 Fed.Reg. 2536 (Feb. 5, 1971). Thus, the IHS was bound to comply with A.P.A. rulemaking procedures in this case despite the otherwise applicable exemption found at subsection (a)(2) of section 553. Morton v. Ruiz, supra at 235, 94 S.Ct. 1055; Rodway v. United States Dep't of Agriculture, 168 U.S.App.D.C. 387, 514 F.2d 809 (1975); Florida v. Weinberger, 401 F.Supp. 760 (1975).

The IHS policy which authorizes the denial of contract health care to off-reservation Indians otherwise within the scope of the IHS program has no effect for lack of publication in the Federal Register and for lack of issuance in accord with A.P.A. rulemaking procedures. Texaco v. F.P.C., supra at 745; Gardiner v. Tarr, 341 F.Supp. 422, 435 (D.D.C.1972); Pharmaceutical Mfr's Ass'n v. Finch, supra at 868. See Morton v. Ruiz, supra at 236, 94 S.Ct. 1055. Further, administrative actions taken pursuant to this unpublished policy are void with respect to persons adversely affected thereby. Northern California Power Agency v. Morton, 396 F.Supp. 1187, 1191 (D.D.C.1975). This conclusion is based on the A.P.A. provision that "[e]xcept to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. 5 U.S.C.A. § 552(a)(1) (1967). Because the contested IHS policy pronouncement contained in the memorandum is vague and inconsistently implemented it cannot be considered to have provided "timely" or advance notice by which actions could be guided, as contemplated by the A.P.A. Northern California Power Agency v. Morton, supra. Therefore, defendants are responsible for paying the outstanding balance of

---

18. The court's conclusions as to the contested policy's modification of existent law and its significant impact upon the substantive rights of a segment of the public render inapplicable

section 552(a)(2)(C), which states that administrative instructions to staff that affect a member of the public need only be available for public inspection and copying.

**662**

Mrs. Lewis' health care bill from St. Vincent hospital, and they will be enjoined from refusing to consider Indians for participation in the IHS contract care program on the sole ground that they are classifiable as off-reservation pursuant to their unpublished policy.

The Court's resolution of plaintiffs' procedural challenge renders any decision of plaintiffs' remaining claims unnecessary.

The Court will enter an Order consistent with the findings and conclusions contained in this Memorandum Opinion.