**Slip Op. 03-131**

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CATHEDRAL CANDLE COMPANY<br><br>    and<br><br>THE A.I. ROOT COMPANY<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES INTERNATIONAL TRADE COMMISSION, DEANNA TANNER OKUN, Chairman,<br><br>    and<br><br>UNITED STATES BUREAU OF CUSTOMS AND BORDER PROTECTION, ROBERT C. BONNER, Commissioner,<br><br>    Defendants. | BEFORE: Pogue, Judge<br><br>Court No. 03-00196 |

[Plaintiffs' motion for judgment on the agency record denied; judgment entered for defendants.]

Decided: October 14, 2003

PATTON BOGGS LLP (Daniel E. Waltz, Steven M. Schneebaum, Martha M. Kendrick, Amy Davine Kim) for Plaintiffs Cathedral Candle Company and The A.I. Root Company.

Lyn M. Schlitt, General Counsel, James M. Lyons, Deputy General Counsel, Mark B. Rees, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, for Defendant U.S. International Trade Commission.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Paul D. Kovac, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Ellen C. Daly, Senior Attorney, Office of the Chief Counsel, United States Bureau of Customs and Border Protection, Of Counsel, for Defendant U.S. Bureau of Customs and Border Protection.

## OPINION

**POGUE, Judge:** This matter is before the Court on Plaintiffs' motion for judgment upon the agency record. Plaintiffs allege that Defendants unlawfully deprived them of their share of 2001 and 2002 distributions under the Continued Dumping and Subsidy Offset Act of 2000. 19 U.S.C. § 1675c (2000). The Court has jurisdiction under 28 U.S.C. § 1581(i). The Court denies Plaintiffs' motion and grants judgment for Defendants.

## Background

On September 4, 1985, the National Candle Association filed an antidumping petition alleging material injury or threat of material injury to a domestic industry from imports of petroleum wax candles from China. Petroleum Wax Candles From the People's Republic of China, 50 Fed. Reg. 39,743, 39,745 (Dep't. Commerce Sept. 30, 1985) (initiation of antidumping duty investigation). During the consideration of the petition by the Department of Commerce and Defendant International Trade Commission ("ITC"), questionnaires were sent to domestic producers of candles. E.g., Candles From the People's Republic of China, Producer's Questionnaire, ITC's Certified Admin. Rec. ("ITC CAR") List 1, Doc. 1 ("Blank Questionnaire"); Response from the A.I. Root Company to Candles From the People's Republic of China Producer's Questionnaire, ITC CAR List 1, Doc. 2 (June 20, 1986) ("Root's Quest. Resp."); Response from Cathedral Candle Company to Candles from the People's

Republic of China Producer's Questionnaire, ITC CAR List 1, Doc. 3 (May 29, 1986) ("Cathedral's Quest. Resp."). Both Plaintiffs received questionnaires. Id. Respondents to the questionnaires were asked to state whether they supported the National Candle Association's petition. Root's Quest. Resp. at 5; Cathedral's Quest. Resp. at 5. Plaintiffs both replied in the affirmative. Id. After an investigation, on August 28, 1996, the Department of Commerce published an antidumping order covering the Chinese imports. Petroleum Wax Candles from the People's Republic of China, 51 Fed. Reg. 30,686, 30,686-87 (Dep't Commerce Aug. 28, 1986) (antidumping duty order).

The Continued Dumping and Subsidy Offset Act of 2000 ("Byrd Amendment" or "the Act") directs that funds collected pursuant to antidumping and countervailing duty orders be annually distributed to "affected domestic producers" ("ADPs"). 19 U.S.C. § 1675c(a). The Byrd Amendment defines an "affected domestic producer" as any party who was a petitioner or supporter of an antidumping or countervailing duty petition, and who remains in operation. 19 U.S.C. § 1675c(b)(1).

Under the Byrd Amendment, ITC must forward to Defendant United States Bureau of Customs and Border Protection ("Customs") a list of ADPs ("the potential eligibility list"). 19 U.S.C. § 1675(b), (d). Customs, in turn, must publish the potential eligibility list in the Federal Register at least thirty days before it distributes

any of the collected duties, so that ADPs may file certifications of their eligibility, and submit a claim to receive a portion of the collected duties. 19 U.S.C. § 1675c(d)(2). The Act also authorizes Customs to promulgate, by regulation, procedures to be followed in distributing collected duties. 19 U.S.C. § 1675c(c).

Pursuant to the Byrd Amendment, on December 29, 2000, Defendant ITC transmitted to Defendant Customs a list of affected domestic producers for all antidumping and countervailing duty orders then in effect, including the 1986 order covering petroleum wax candles from China. Letter from Stephen Kaplan, Chairman, Int'l Trade Comm'n, to The Honorable Raymond Kelly, Comm'r of Customs, ITC CAR List 1, Doc. 5 at 5. (Dec. 29, 2000) ("ITC Support List"). In the letter accompanying the list ("the explanatory letter"), Defendant ITC explained that it believed provisions of the Byrd Amendment were in conflict with § 777(b)(1)(a) of the Tariff Act of 1930 ("Tariff Act"). See id. at 1. That section deals with the confidentiality of certain information provided to the agency, including any information designated as proprietary by the party providing the information. 19 U.S.C. § 1677f(b)(1)(A). The ITC maintains that its practice is to regard indications of support for a petition as confidential information; moreover, the words "Business Confidential" appeared at the top of the pages of the questionnaire used in evaluating the petroleum wax candle petition. Def. ITC's Opp'n to Mot. J. Agency R. at 16-17; 19

C.F.R. § 201.6 (2000); Blank Questionnaire, ITC CAR List 1, Doc. 1.

Having explained its belief that there was a conflict between the Act and its regulation under the Tariff Act, Defendant ITC placed on the potential eligibility list only the names of those ADPs who had affirmatively waived the confidentiality of their questionnaire responses. ITC Support List, ITC CAR List 1, Doc. 5. Defendant Customs published the list as provided by Defendant ITC on its website by early 2001, along with the explanatory letter. Def. ITC's Opp'n to Mot. J. Agency R. at 23. In June 2001, Customs published a notice of the receipt of the list and its online publication. Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 66 Fed. Reg. 33,920, 33,920-21 (Dep't Treasury June 26, 2001) (proposed rule) ("June 26, 2001 Notice"). The June 26, 2001 notice also stated that the list would be updated as necessary, and asked that any issues regarding the list be brought to the ITC's attention. Id.

In August 2001, Customs published, in accordance with the Byrd Amendment, a notice of proposed distribution in the Federal Register. Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 66 Fed. Reg. 40,782 (Dep't Treasury Aug. 3, 2001) (notice of intent to distribute offset for fiscal year 2001) ("August 3, 2001 Notice"). That notice contained an updated list of ADPs, but was not accompanied by any explanation of the effects of the Tariff Act or the ITC's confidentiality

regulation.  Id.  The August 3, 2001 notice also stated that certifications for ADPs claiming distributions under the Byrd Amendment had to be filed by a certain date (either October 2, 2001, or within ten days of the publication of a Final Rule regarding distributions).[1]  Id.

Plaintiffs' names did not appear on the potential eligibility list at any time during 2001.  ITC Support List, ITC CAR List 1, Doc. 5; August 3, 2001 Notice, 66 Fed. Reg. at 40,782.  Plaintiffs did not file for certification for that year. On July 3, 2002, Customs published a new notice of intent to distribute collected duties, accompanied by the list of ADPs.[2]  Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 67 Fed. Reg. 44,722, 44,724-41 (Dep't Treasury July 3, 2002) (notice of intent to distribute offset for fiscal year 2002) ("July 3, 2002 Notice").  This notice required that certifications

---

[1]Customs promulgated a rule requiring that certifications be filed within sixty days of the publication of notice of intent to distribute in the Federal Register.  19 C.F.R. § 159.63(a)(2001). This deadline for certification filing ensures that Customs meets its own statutory deadline for calculating and distributing claimants' shares of collected duties.  19 U.S.C. § 1675c(c).
   The final rule regarding distributions was published in the Federal Register on September 21, 2001. Distribution of Continued Dumping and Subsidy  Offset to Affected Domestic Producers, 66 Fed. Reg. 48,546, 48,553 (Dep't Treasury, Sept. 21, 2001) (final rule).

[2]We note that the list of ADPs was not static. According to Customs, the potential eligibility list was continuously updated from the time it appeared on Customs' website as ADPs that had initially not been listed demonstrated their eligibility for certification. Def. Customs' Opp'n to Mot. J. Agency R. at 14-16.

of eligibility to receive distributions be filed by September 3, 2002. Id. at 44,722. Plaintiffs' names did not appear on the list of affected domestic producers published with the July 3, 2002 notice. See id. at 44,724-41.

In late 2002, Plaintiffs learned through "back channels" that they likely were eligible for a share of duties collected pursuant to the antidumping order on wax petroleum candles from China. See Pls.' Reply Mot. J. Agency R. at 10-11. Plaintiffs wrote to the ITC to request a review of the record to determine if they had supported the National Candle Association's petition, additionally waiving the confidentiality of their questionnaire responses. Letter from Louis Steigerwald III, Pres., Cathedral Candle Company, to Lynn Featherstone, Dir., Office of Investigations, ITC, ITC CAR List 1, Doc. 6 (Sept. 19, 2002); Letter from Brad I. Root, Vice Pres., The A.I. Root Company, to Lynn Featherstone, Dir., Office of Investigations, ITC, ITC CAR List 1, Doc. 7 (Sept. 23, 2002). The ITC replied to both parties, affirming that they had supported the petition. Letter from Deanna Tanner Okun, Chairman, ITC, to Louis Steigerwald III, Pres., Cathedral Candle Company, ITC CAR List 1, Doc. 10 (Sept. 24, 2002); Letter from Deanna Tanner Okun, Chairman, ITC, to Brad I. Root, Vice Pres., the A.I. Root Company, ITC CAR List 1, Doc. 12 (Sept. 25, 2002). Cathedral Candle Company and the A.I. Root Company then attempted to file certifications of eligibility for 2002 distributions with Customs on October 2, 2002

and October 8, 2002, respectively.  Def. Customs' Opp'n Mot. J. Agency R. at 22; Letter from David C. Smith, Jr., Collier Shannon Scott PLLC, to Jeffrey J. Laxague, Office of Regs. and Rulings, Customs, Customs' Cert. Admin. Rec. ("Customs CAR") Doc. 1 (Oct. 2, 2002); Letter from David C. Smith, Jr., Collier Shannon Scott, PLLC, to Jeffrey J. Laxague, Office of Regs. and Rulings, Customs, Customs CAR Doc. 2 (Oct. 8, 2002).[3]  These attempts were rejected by Customs as untimely, the September 2 deadline having passed. Letter from Michael T. Schmitz, Ass't Comm'r, Office of Regs. and Rulings, Customs, to David C. Smith, Collier Shannon Scott, PLLC, Customs CAR Doc. 3 (Dec. 12, 2002); Letter from Michael T. Schmitz, Ass't Comm'r, Office of Regs. and Rulings, Customs, to David C. Smith, Collier Shannon Scott, PLLC, Customs CAR Doc. 4 (Dec. 12, 2002).

In the instant claim, Plaintiffs ask the Court to direct that Customs distribute to them their share of duties for both 2001 and 2002.  They ask that their late certification filings be excused because of the ITC's and Customs' unlawful actions.  Specifically, Plaintiffs allege that Defendants unlawfully (1) interpreted the provisions of the Byrd Amendment and Tariff Act so as to cause only those affected domestic producers who had waived confidentiality to appear on the list provided by the ITC to Customs and (2) failed to

---

[3]While Plaintiffs are represented by PATTON BOGGS, PLLC in this case, it appears their prior counsel in this matter was Collier Shannon Scott, PLLC.

provide adequate notice of their interpretation of the two laws.

## Standard of Review

When this Court takes jurisdiction pursuant to 28 U.S.C. § 1581(i), it will "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 2640(e). The scope of review under this "arbitrary and capricious" standard is narrow. Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Where the agency whose action is under review shows a "rational connection between the facts found and the choice made," the Court will not substitute its own judgment for that of the agency. See id. (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)). Even where the agency's decision is "of less than ideal clarity," it will be upheld as long as the Court can reasonably discern how the agency arrived at that decision. Bowman Trans., Inc., v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974) (internal citation omitted).

Even if an agency's decision is not arbitrary or capricious, however, it must still be "in accordance with law." F.C.C. v. NextWave Pers. Communications Inc., __ U.S. __, __, 123 S.Ct. 832, 838 (2003) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413-14 (1971)). This means not only the laws

that the agency itself is charged with interpreting, but all law.
Id.

Accordingly, the Court reviews the agency's decision to determine whether it is rational, defensible, and in accordance with law.

## Discussion

Customs promulgated the rule now set out at 19 C.F.R. § 159.63(a) to provide procedures for filing certifications of eligibility for Byrd Amendment Distributions. This regulation states that:

> In order to obtain a distribution of the offset, each affected domestic producer must submit a certification, in triplicate, or electronically as authorized by Customs, to the Assistant Commissioner, Office of Regulations and Rulings, Headquarters, or designee, that must be received within 60 days after the date of publication of the notice [of intent to distribute duties] in the Federal Register, indicating that the affected domestic producer desires to receive a distribution.

19 C.F.R. § 159.63(a). Pursuant to this regulation, Plaintiffs' claim of eligibility to receive distributions for 2001 and 2002 is untimely.

Accordingly, the Court need not consider the legality of Defendants' interpretation of the Byrd Amendment and the Tariff

Act, as it is not the decisive issue in this case.[4] While Defendants may have been less than explicit in providing notice of their interpretation of the two statutes, they were quite explicit about the deadline for certification filings. August 3, 2001 Notice, 66 Fed. Reg. at 40,782; July 3, 2002 Notice, 67 Fed. Reg. at 44,722. Plaintiffs, on the whole, had ample time to discover that they were not on the list of ADPs, and to inquire as to the reason for this exclusion or to ask for an amendment of the list before certification filings were due. Nevertheless, the Court briefly discusses Plaintiffs' contentions as to Defendants' statutory interpretation and notice, if only to clarify why these issues are not decisive to the case at bar.

In this case, the agencies were confronted with a statutory ambiguity arising not from the words of a single statute, but from the interplay between two statutes. The Byrd Amendment directs the ITC to prepare a list of all petitioners and petition supporters still in business. 19 U.S.C. § 1675c(b). This seems clear enough. The ITC, however, has long interpreted § 777 of the Tariff Act and their own regulation, 19 C.F.R. § 201.6, to keep respondents'

---

[4]The Court notes that Defendants' interpretation of the interplay between the two statutes, not having been promulgated according to a "relatively formal administrative procedure," is not due Chevron deference. See United States v. Mead Corp., 533 U.S. 218, 230 (2001).

support for questionnaires confidential.[5]  Def. ITC's Opp'n Pls.'

Mot. J. Agency R. at 16-17.

Neither the statute nor the regulation explicitly requires

that the identity of petition supporters or the fact of their

---

[5]Title 19 U.S.C. § 1677f(b)(1)(A) states:

    (A) In general. Except as provided in subsection
(a)(4)(A)of this section and subsection (c)of this
section, information submitted to the administering
authority or the Commission which is designated as
proprietary by the person submitting the information
shall not be disclosed to any person without the
consent of the person submitting the information, other
than–
    (i) to an officer or employee of the administering
authority or the Commission who is directly concerned
with carrying out the investigation in connection with
which the information is submitted or any review under
this title covering the same subject merchandise, or
    (ii) to an officer or employee of the United
States Customs Service who is directly involved in
conducting an investigation regarding fraud under this
title.
19 U.S.C § 1677f(b)(1)(A).

Title 19 C.F.R. § 201.6(a)(1) provides, in part:

    (a) Definitions. (1) Confidential business
information is information which concerns or relates to
. . . other information of commercial value, the
disclosure of which is likely to have the effect of
either impairing the Commission's ability to obtain
such information as is necessary to perform its
statutory functions, or causing substantial harm to the
competitive position of the person, firm, partnership,
corporation, or other organization from which the
information was obtained, unless the Commission is
required by law to disclose such information. The term
"confidential business information" includes
"proprietary information" within the meaning of section
777(b) of the Tariff Act of 1930 (19 U.S.C. 1677f(b)).
19 C.F.R. § 201.6(a)(1).

support be maintained as confidential information. 19 U.S.C. §
1677(f)(b)(1)(A); 19 C.F.R. § 201.6. However, the questionnaires
distributed in the candle antidumping investigation were labeled
"Business Confidential," thereby putting respondents on notice that
their answers were not to be made publicly available, and bringing
the provisions of 19 U.S.C. § 1677(f)(b)(1)(A) into play. Blank
Quest., ITC CAR List 1, Doc. 1. The ITC's regulation does not
require notice. 19 C.F.R. § 201.6 (2000). Moreover, the ITC
interprets its regulation to permit the agency to maintain
information in confidence, where its release could either hurt the
ITC's ability to obtain information in future investigations or
harm the business competitiveness of questionnaire respondents.
Def. ITC's Opp'n to Mot. J. Agency R. at 16-17.[6]

Plaintiffs argue that the Court should understand the Byrd
Amendment, by its silence on the issue of confidentiality, to
supersede or bypass any other law or regulation on that point. See
Pls.' Reply Mot. J. Agency R. at 11-12. It is true, as Plaintiffs
point out, that Congress is "presumed to legislate against the

---

[6]Plaintiffs argue that the ITC furnishes no proof that the
agency's ability to collect information or respondents'
competitiveness would be harmed by disclosure of the identity of
questionnaire respondents and their support of a petition. They
argue that an agency may not simply rely on speculation in
defending the reasonableness of its interpretations, and that an
interpretation unsupported by empirical evidence is not entitled
to deference. Pls.' Reply Mot. J. Agency R. at 10. The Court
does not reach this issue, as it decides this case on other
grounds.

backdrop of existing law." Id. at 11; see also Morgan v. Principi,

327 F.3d 1357, 1361 (Fed. Cir. 2003) (internal citation omitted).

However, this argument works both ways.  It may either be that

Congress intended the Byrd Amendment to trump the confidentiality

provisions of the Tariff Act, or, knowing of the Tariff Act's

requirements and the ITC's practice, expected only those ADPs who

had waived confidentiality to receive distributions.  The scant

legislative history of the Amendment cannot offer the Court, as it

could not offer Defendants, much insight into which interpretation

Congress preferred.[7]  Exercising a traditional canon of statutory

---

[7]The Byrd Amendment, codified at 19 U.S.C. § 1675c, was passed as Title X of Pub. L. No. 106-387 (2000), a large appropriations bill.  The Act was proposed in the Senate in January, 1999 by Sen. DeWine (OH), and in the House in February, 1999 by Rep. Regula (OH).  S. 61, 106th Cong. (1999); H.R. 842, 106th Cong. (1999).  The identical bills failed to garner support. However, the text was later inserted as a rider into the appropriations  bill.  H.R. 4461, 106th Cong. (2000)(enacted); H.R. 5426, 106th Cong. §§ 1001-1003 (2000)(enacted).  The Act was not debated and consequently comes to the Court with little history, other than a set of findings that accompany the legislation.  They are as follows:

> (1) Consistent with the rights of the United States under the World Trade Organization, injurious dumping is to be condemned and actionable subsidies which cause injury to domestic industries must be effectively neutralized.
> (2) United States unfair trade laws have as their purpose the restoration of conditions of fair trade so that jobs and investment that should be in the United States are not lost through the false market signals.
> (3) The continued dumping or subsidization of imported products after the issuance of antidumping orders or findings or countervailing duty orders can frustrate the remedial purpose of the laws by preventing market prices from returning to fair levels.

construction, Defendants attempted to give as much effect to both laws as was possible.[8]

Defendants did not give notice of their interpretation in the Federal Register, but the interpretation did appear on Customs' website in the form of the explanatory letter that ITC provided to Customs, along with the ITC's preliminary list of ADPs.[9] Def. ITC's Opp'n to Mot. J. Agency R. at 23. Moreover, a Federal Register notice describing the list's availability online to interested parties alerted such parties to the list at least, and possibly to

---

(4) Where dumping or subsidization continues, domestic producers will be reluctant to reinvest or rehire and may be unable to maintain pension and health care benefits that conditions of fair trade would permit. Similarly, small businesses and American farmers and ranchers may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable.
(5) United States trade laws should be strengthened to see that the remedial purpose of those laws is achieved.

H.R. 5426, 106th Cong. § 1002 (2000) (enacted).

[8]The legislature is presumed to intend to achieve a consistent body of law.  In accord with this principle subsequent legislation is not presumed to repeal the existing law in the absence of expressed intent.  Courts are reluctant to repeal by implication even when the later statute is not entirely harmonious with the earlier one.  If two statutes conflict somewhat, the Court must, if possible, read them so as to give effect to both, unless the text or legislative history of the later statute shows that Congress intended to repeal the earlier one and simply failed to do so expressly.  1A Norman A. Singer, Statutes and Statutory Construction, § 23.9 (6th ed. 2002).

[9]The list also appeared on ITC's website at this time.  See Def. ITC's Opp'n to Mot. J. Agency R. at 23.

the letter.  June 26, 2001 Notice, 66 Fed. Reg. at 33,920-21.[10]

Most importantly, while the particular interpretation adopted by

the ITC and Customs was not the subject of explicit notice, the

fact that the two agencies were preparing a list of ADPs who would

be eligible for Byrd Amendment distributions had been announced in

the terms of the Byrd Amendment itself.  19 U.S.C. § 1675c.  The

enactment of the Byrd Amendment was hardly a secret -- its effects

were widely discussed in the media, if only because of the Byrd

Amendment's controversial nature under the rules of the World Trade

---

[10]It is well established by both statutes and cases that the publication of an item in the Federal Register constitutes constructive notice of anything within that item.  44 U.S.C. § 1507; Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380 (1947); Stearn v. Dep't of the Navy, 280 F.3d 1376, 1384-85 (Fed. Cir. 2002).  Plaintiffs were on constructive notice of the existence of the list and Customs' request that questions be directed to the ITC from the time of publication onward.

Plaintiffs argue that under Morton v. Ruiz, Defendants should have notified them of the precise interpretation. Pls.' Reply Mot. J. Agency R. at 14. That case, however, is factually distinguishable. Morton dealt with an interpretation by the Bureau of Indian Affairs that limited assistance under the Snyder Act to Native Americans living on reservations, rather than extending it to those who also lived near reservations. Morton v. Ruiz, 415 U.S. at 204 (1974). This interpretation plainly contradicted the Bureau's own prior interpretation and the legislative history of the Snyder Act and Congress' annual appropriations laws. Morton, 415 U.S. 199, 229. The instant case is not similar. Rather, the ITC and Customs undertook to enforce the plain letter of the Tariff Act and their regulation pursuant to the Act while simultaneously giving effect to the Byrd Amendment. Moreover, the resulting interpretation cannot have been said to affect Plaintiffs' actual rights to receive Byrd Amendment distributions; they were still ADPs and eligible to apply for certification.

Organization.[11]

Plaintiffs further argue that Defendants' failure to give notice of their interpretation violates the Administrative Procedure Act. Pls.' Mot. J. Agency R. at 11-15. Plaintiffs claim that Defendants should either have published their interpretation in the Federal Register or given personal notice to affected parties under 5 U.S.C. § 553(b). Id. at 15. However, Defendants' interpretation would be, if a rule at all, an interpretive rule-- one which merely clarifies the agency's position regarding the meaning of a statute or its own regulations. See Splane v. West, 216 F.3d 1058, 1063 (Fed. Cir. 2000). At least one Court addressing this issue has held that publication of an interpretive rule is only required where that interpretive rule reflects a change in policy. Knutzen v. Eben Ezer Lutheran Hous. Ctr., 815 F.2d 1343, 1351 (10th Cir. 1987) (internal citations omitted). Here, rather than a change in policy, there appears to be the application of an old policy (confidentiality of questionnaire

_____

[11]A search of the LexisNexis news database for the terms "Byrd Amendment," restricted to only those articles appearing between October 1, 2000 and October 1, 2001, found 293 articles discussing the Byrd Amendment and its effects. LEXIS, News Group File (All) (conducted Oct. 2, 2003). The Byrd Amendment was widely discussed in business and trade publications, but also in general circulation newspapers.

We note also that the WTO Appellate Body recently ruled that the Byrd Amendment is inconsistent with U.S. obligations under the Agreement on Antidumping. United States-Continued Dumping and Subsidy Offset Act of 2000 - AB-2002-7 - Report of the Appellate Body, WT/DS217/AB/R, 46 Bernan's Annot. Rep. 97 (Jan. 16, 2003).

responses) to a new statute.  However, even if the publication of

all interpretive rules is required under the Freedom of Information

Act, 5 U.S.C. § 552, it is not clear that it was necessary for

Plaintiffs here to be apprised of the particular interpretation

adopted by Defendants in order to act to protect their rights under

the Byrd Amendment.[12]

---

[12]Though the Court need not decide this issue, it seems probable that 5 U.S.C. § 552 would not require publication of the interpretation at issue here. While 5 U.S.C. § 553 exempts interpretive rules from publication, 5 U.S.C. § 552 requires that certain interpretations be published, while others need only be made available to the public on request.  5 U.S.C. § 552(a)(1); 552(a)(2).  5 U.S.C. § 552(a)(1)(D) requires the Federal Register publication of "statements of general policy or interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D).  However, subsection 552(a)(2)(B) contemplates the existence of "statements of policy and interpretations which have been adopted by the agency" that need not be published in the Federal Register.  5 U.S.C. § 552(a)(2)(B).  One federal court stated the requirements this way:

> In determining whether particular policy or interpretive statements are required to be published or whether they need only be made available [to the public upon request], subsections (a)(1) and (a)(2) of section 552 must be read together: "statements of policy" must be available and "statements of general policy" must be published; "interpretations which have been adopted by the agency" must be available and "interpretations of general applicability" must be published.

Lewis v. Weinberger, 415 F. Supp. 652, 659 (D.N.M. 1976) (internal citation omitted).  The case goes on to state:

> A policy statement is not qualified as "general" nor is an administrative interpretation deemed to be "of general applicability" if: (1) only a clarification or explanation of existing laws or regulations is expressed; and (2) no significant impact upon any segment of the public results. . . . [P]olicy or

While Plaintiffs appear to have been unaware at the time of the Act's passage that they had some fifteen years previously participated in an antidumping investigation, it is far from clear that Defendants were under an obligation to inform them of this. Defendants were under an obligation to compile and publish a list of ADPs. 19 U.S.C. § 1675c(d). Even if that list were imperfect, Plaintiffs were on constructive notice of the list's existence.[13] Plaintiffs could have petitioned to be added to the list at any time from its public debut on Customs' website in March 2001 until certifications were due for that year. Even having missed the deadline for 2001 distributions, Plaintiffs could have petitioned for addition to the list and certification for 2002 distributions at any time after the 2001 deadline until September 2, 2002.

---

> interpretive statements are deemed to fall within the
> scope of 552(a)(1)(D), requiring their publication,
> when they adopt new rules or substantially modify
> existing rules, regulations, or statutes . . .

Lewis, 415 F. Supp. at 659 (internal citations omitted). The ITC's interpretation of the interplay between the Tariff Act and the Byrd Amendment, as evidenced by the explanatory letter to Customs, appears to be a clarification or explanation of the Tariff Act. Moreover, the interpretation does not seek to adopt a new rule, but to apply an old one in a new context.

[13]Plaintiffs claim that it is unfair to consider them on constructive notice of something that did not appear in the Federal Register, i.e., their names. Pls.' Reply Mot. J. Agency R. at 5. While it is true that Plaintiffs' names at no time appeared in the Federal Register as part of the list of ADPs, they were on constructive notice that the list existed, that they could direct questions to the ITC and even, through a comparison of the June 2001, August 2001, and July 2002 lists, that updates were occurring.

In short, it was not necessary for Plaintiffs to know why they had been left off the list in order to make inquiries. Plaintiffs may have been honestly unaware of the implications of the Byrd Amendment, remaining uninformed about their ability to apply for certification for distributions for over two years after the Byrd Amendment's enactment.  However, while this is certainly a shame, it is also in no way Defendants' responsibility.  Defendants were not required by either the Byrd Amendment or any other law to personally notify ADPs of the Act and its effects.  Moreover, Defendants gave ample time for corrections to be made to the list and the Federal Register notices of intent to distribute were clear about the certification deadlines.[14]

Failure to meet the regulatory deadlines cannot be excused as a result of Customs and the ITC's separate failure to explicitly

---

[14]There is some debate between the parties as to whether Defendants would have allowed a certification filing by a company not on the list of ADPs.  Even assuming, arguendo, that Defendants would not have allowed such a filing, Plaintiffs were in no way prevented from asking for an evaluation of their eligibility, and then proceeding to file a certification after receiving an affirmative evaluation.  In fact, when Plaintiffs became aware of their probable eligibility for Byrd Amendment distributions, this is just the course they took.  See Letter from David C. Smith, Jr., Collier Shannon Scott, PLLC, to Jeffrey J. Laxague, Office of Regs. and Rulings, Customs, Customs CAR Doc. 1 (Oct. 2, 2002); Letter from David C. Smith, Jr., Collier Shannon Scott, PLLC, to Jeffrey J. Laxague, Office of Regs. and Rulings, Customs, Customs CAR Doc. 2 (Oct. 8, 2002);  Letter from Michael T. Schmitz, Ass't Comm'r, Office of Regs. and Rulings, Customs, to David C. Smith, Collier Shannon Scott, PLLC, Customs CAR Doc. 3 (Dec. 12, 2002); Letter from Michael T. Schmitz, Ass't Comm'r, Office of Regs. and Rulings, Customs, to David C. Smith, Collier Shannon Scott, PLLC, Customs CAR Doc. 4 (Dec. 12, 2002).

notify the public of precisely why certain names were kept off the published list of ADPs.  While Plaintiffs argue that they cannot be held responsible for not noticing that their names were not in the Federal Register, they can be held to have been on notice, due to the three Federal Register notices published by Customs, along with the website publication of the list of ADPs and the explanatory letter, that there was a list, that they possibly should have been on it, and that there was a specific deadline for filing their claims.[15]

---

[15]The court notes that the instant case is distinguishable from a line of cases arising out of FCC licensing. For instance, Satellite Broad. Co. v. F.C.C., 824 F.2d 1 (D.C. Cir. 1987), dealt with conflicting and confusing FCC regulations regarding the place of filing.  The FCC had reasonably interpreted its regulations to require filing in Gettysburg, Pennsylvania. However, one company applying for a license had also reasonably interpreted the regulations to require filing in Washington, D.C. Id.  Their application was forwarded from D.C. to Gettysburg by FCC officials, but by the time it reached Gettysburg, the filing deadline had passed and the FCC denied the application as untimely.  Id.  The Court of Appeals for the D.C. Circuit remanded the case to the FCC, stating that where there are two reasonable interpretations of regulations, the FCC cannot choose between them to the detriment of an applicant without making its choice clear.  Satellite Broad. Co., 824 F.2d at 5.  While Satellite Broad. Co. seems superficially similar to the case at bar, Satellite Broad. Co. dealt with punishing a party for breaking a rule of which it had no clear notice–the rule requiring that applications be filed in Gettysburg.  In this case, Plaintiffs do not allege that they are being punished for failing to comply with an agency rule about which they had no notice.  If they are being punished for failure to comply with any rule, it is the deadline set by Defendants for certification filings, a rule of which Plaintiffs had ample notice.  Moreover, the exact method of filing a certification was made abundantly clear by Defendants through their Federal Register notices.

## Conclusion

Therefore, because it cannot be shown that Defendants' dismissal of Plaintiffs' applications as untimely was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, Plaintiffs' motion for judgment on the agency record is denied, and judgment is entered for Defendants.

_____

Donald C. Pogue
Judge

Dated:    New York, New York
          October 14, 2003

ERRATUM


Please make the following change to <u>Cathedral Candle Co. v. U.S. Int'l Trade Comm'n</u>, Slip Op. 03-131, October 14, 2003, Court No. 03-00196:

On page 4, first paragraph, at the fifth line, "Kaplan" should instead be "Koplan."

October 17, 2003